T.C. Memo. 2003-152


UNITED STATES TAX COURT


DAVID M. AND TERI L. SAYKALLY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

COMPUTER POWER SOFTWARE GROUP, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 555-00, 1821-00.    Filed May 27, 2003.


    P has extensive technical expertise in the
computer software industry. P's wholly owned
corporation, C, was engaged in the marketing of
software products.  P and C entered into an agreement
whereby P agreed to have research and development (R&D)
done in order to create developed technology.  Under
the agreement, P would own the developed technology and
license it to C in exchange for royalties.  P intended
that C would market the developed technology to its
customers.  P deducted his 1995 and 1996 R&D
expenditures on Schedules C.  R disallowed P's R&D
deductions on the ground that they were not incurred in
a trade or business.

    <u>Held</u>:  At all times, P intended to market the
developed technology through C.  P did not have the
objective intent to use the developed technology in an
activity that would constitute his own trade or

business and is not entitled to a current deduction for his R&D expenses.

Held, further, Ps did not adequately substantiate other deductions disallowed by R.

Held, further, Ps are not liable for accuracy-related penalties associated with the deduction of R&D expenses. Ps are liable for accuracy-related penalties with respect to their failure to substantiate other disallowed deductions.


Robert R. Rubin, for petitioners.

Kathryn K. Vetter, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


RUWE, Judge: These cases were consolidated by motion of the parties for purposes of trial, briefing, and opinion. In docket No. 1821-00, respondent determined a deficiency in Federal income tax of $103,250 and a section 6662(a)[1] accuracy-related penalty of $20,650 for the taxable year 1996 with respect to petitioner Computer Power Software Group, Inc. (CPSG, Inc.). In docket No. 555-00, respondent determined deficiencies in petitioners David M. and Teri L. Saykally's[2] income taxes, an addition to tax pursuant to section 6651(a)(1), and accuracy-

---

[1]All section references are to the Internal Revenue Code in effect for the taxable years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Petitioners David M. and Teri L. Saykally filed joint Federal income tax returns for the taxable years at issue.

related penalties pursuant to section 6662(a) for the taxable years 1994, 1995, and 1996 as follows:

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalties Sec. 6662(a) |
|------|-----------|--------------------------------|------------------------|
| 1994 | $11,729 | $253 | $2,346 |
| 1995 | 16,769 | -- | 3,354 |
| 1996 | 634,289 | -- | 126,858 |

For convenience, we refer to David M. and Teri L. Saykally as petitioners and David M. Saykally as petitioner throughout this opinion.

After concessions,[3] the remaining issues to be decided are as follows:

(1) Whether petitioners are entitled to deduct expenses claimed for research and development for taxable years 1995 and 1996 in the respective amounts of $67,534 and $1,421,645;

(2) Whether petitioners are entitled to deduct certain expenses on their Schedules C, Profit and Loss From Business, for the taxable years 1994, 1995, and 1996; and

---

[3]The parties have conceded that there will be no deficiency in tax due from or overpayment in tax due to petitioner CPSG, Inc. Therefore, an accuracy-related penalty under sec. 6662(a) will not be imposed. Accordingly, the parties have resolved all the issues in docket No. 1821-00.

With respect to petitioners in docket No. 555-00, respondent has conceded, inter alia, that petitioners are not liable for the sec. 6651(a)(1) addition to tax for the taxable year 1994.

(3) Whether petitioners are liable for accuracy-related penalties pursuant to section 6662 for the taxable years 1994, 1995, and 1996.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, stipulations of settled issues, and the attached exhibits are incorporated herein by this reference. At the time of filing the petition, petitioners resided in Granite Bay, California.

Research and Development Expenses

Petitioner has extensive familiarity with, and technical expertise in, the computer software industry spanning more than 30 years. In 1991, Computer Power Group Limited (CPG) hired petitioner on a contract basis to provide it with consulting services. CPG is a large professional services company organized under the laws of Australia. CPG was in the business of providing professional computer programmers to companies to create business software. Additionally, CPG was involved in the worldwide marketing of several lines of business software applications. CPG was losing money on the marketing of its software applications. Petitioner was hired on a short-term

basis to provide consulting services to CPG to identify why CPG was losing money and how to stop such losses.[4]

After conducting onsite inspections and reviewing pertinent information, petitioner reported to CPG's chief executive officer regarding his ideas on how to stop the "profit bleed".  In response, CPG attempted to hire petitioner to implement his ideas.  Instead of becoming an employee of CPG, the parties agreed to move the marketing of CPG's software out from under CPG and agreed that petitioner would organize his own corporation to market CPG's software products for a stated royalty. Consequently, petitioner organized CPSG, Inc.

CPSG, Inc. is a computer software corporation that was organized in November 1992, pursuant to the laws of the State of California.  During the taxable years at issue, petitioner owned all the outstanding shares of CPSG, Inc., and was its president, chief operating officer, and sole director.

Beginning in 1992, CPG was a party to contracts with three Australian syndicates that were engaged in software development (the syndicates).  The syndicates were Australian tax-advantaged research and development partnerships.  The syndicates provided financing to CPG for the development of new software technology. The syndicates raised approximately $20 million for CPG's

_____

[4]Petitioner was known in the computer industry as a turnaround specialist.

software research and development work. Approximately 75 percent of the money raised, or $15 million was supposed to be used for the development of CPG's software. In return, the syndicates owned the rights to the software technology and licensed those rights to CPG.

On August 10, 1993, petitioner, CPSG, Inc., and CPG entered into a Software Marketing and Management Agreement (the management agreement) whereby CPSG, Inc. licensed certain rights to market CPG's software technology and products, including InTEXT, Today, and Operating Control Systems.[5] The management agreement contemplated that CPSG, Inc. would form three subsidiaries, InTEXT Systems, Inc., Today Systems, Inc., and Operating Control Systems, Inc., to market specific lines of CPG's software products.

The management agreement purported to grant CPSG, Inc. the right to market CPG's software products as they existed before the development work funded by the syndicates. In exchange, CPSG, Inc. agreed to pay CPG a royalty. Under the terms of the management agreement, CPG agreed to use its best efforts to provide funds for software product development; the funds were to be obtained from the syndicates.

---

[5]The agreement had a retroactive effective date of Sept. 30, 1992.

Appendix II to the management agreement was a Software Marketing Agreement (submarketer agreement) by and between CPSG, Inc. and CP Software Export Pty Ltd., an entity affiliated with CPG. Under this agreement, CPSG, Inc. would acquire a sublicense to market certain software products developed with funding from the syndicates in exchange for royalty payments. Despite extensive negotiations, this agreement was never executed by the parties. Although the agreement was never executed, the parties decided to operate as if it had been.

In or about May 1995, CPG informed CPSG, Inc. that the syndicates' development funding would terminate in July 1995. In or about July 1995, the syndicates' development funding terminated. The planned development and improvement of the software was not completed. No new marketable and competitive products resulted from the underfunded and unfinished development. Without additional development funding, CPSG, Inc. and its subsidiaries would lose their current customers and would not have software products to attract new customers.

On July 7, 1995, the syndicates notified CPSG, Inc. to cease and desist marketing CPG's software technology purportedly licensed from CPG.[6] The syndicates took the position that CPSG,

---

[6]By the terms of the submarketer agreement, CPSG, Inc. was granted an exclusive license to the newly developed software technology. However, pursuant to par. 2.4, the management agreement provided that its terms could not violate the operating
(continued...)

Inc. had no rights to the technology for which they had provided funding. Essentially, the syndicates, through their representative, informed CPSG, Inc. that the management agreement by and between CPG and CPSG, Inc. to market the software technology conferred no rights on CPSG, Inc. as the syndicates had not approved the agreement.

Petitioner decided to continue the development without funding from the syndicates. Petitioner believed he would have more negotiating leverage with respect to the developed software if he finished development in his own name, instead of in the name of CPSG, Inc. Petitioner's reasons supporting this decision were: (1) CPSG, Inc., as a marketing entity, had no development capability; petitioner was the only person who had the skill set to do the development; (2) it was prudent to create intellectual rights outside of CPSG, Inc. because (i) CPG could cancel the submarketer agreement in 1997 for no reason and, at other times as stated in the agreement; (ii) the syndicates took the position that they could modify or terminate CPSG, Inc.'s rights to the newly developed software technology because the grant from CPG was in conflict with the rights of the syndicates; and (iii) CPG controlled the syndicates and could cause the syndicates to

---

[6](...continued)
terms governing the syndicates. The terms of the syndicates forbade the grant of exclusive rights to the improved technology without explicit permission of the syndicates.

require CPG to terminate the management agreement; (3) CPSG, Inc. did not have the financial resources to fund the development; and (4) petitioner had the financial resources to develop the software technology.

On October 1, 1995, petitioner, in his individual capacity, entered into a development agreement with his wholly owned corporation, CPSG, Inc. According to the terms and conditions of the development agreement, petitioner covenanted to provide software research and development to improve, enhance, modify, and change the software technology in his reasonable discretion and at his sole expense. The contract granted CPSG, Inc. the right to cancel the agreement at anytime with 1 month's notice. The product of petitioner's R&D efforts was what the parties termed the "developed technology". Pursuant to the terms of the contract, petitioner retained all rights, title, and interest in the developed technology.[7] Simultaneously, under the development agreement, petitioner granted CPSG, Inc. a nonexclusive license to the developed technology in exchange for 36 quarterly payments in an amount equal to the greater of 10 percent or $26,250 from the sale, grant of licenses, or commercialization of products that incorporated the developed technology during the period

---

[7]Petitioner testified that this was one of the primary reasons for conducting the development on his own behalf; personal ownership rights, outside of CPSG, Inc., would give him leverage over CPG and the syndicates.

January 31, 1997, through December 31, 2005.[8]  Petitioner

intended that the developed technology would be marketed through

CPSG, Inc.

On October 1, 1995, CPSG, Inc., Computer Power Software

Group Australia Pty Ltd.[9] (CPSGAus), and petitioner entered into

a service agreement whereby CPSGAus agreed to provide

administrative and payroll services to petitioner in his efforts

to develop the software technology.  CPSGAus hired some of the

Australian development staff that had been formerly employed by

the syndicates to continue the research and development on

petitioner's behalf.  CPSGAus invoiced CPSG, Inc. for these

costs.  CPSG, Inc. paid the costs associated with the research

and development on petitioner's behalf and recorded petitioner's

indebtedness for the expenses on CPSG, Inc.'s accounting system.

Petitioner monitored the work performed by the Australian

development "team" via telephone, a visit to Australia, and

electronic mail communications.  Additionally, petitioner helped

solve technical programming problems, prioritized tasks of the

---

[8]The minimum quarterly payments of $26,250 were due and owing to petitioner regardless of whether CPSG, Inc. generated any income from the developed technology.  The development agreement contemplated that petitioner would receive, at the very least, $945,000 over the  term of the agreement (36 quarters).

[9]Petitioner formed CPSGAus in 1994 to manage CPSG, Inc.'s business activities in Australia.  CPSGAus provided development, sales, support, and administrative services to CPSG, Inc.'s subsidiaries: InTEXT Systems, Inc., Operating Control Systems, Inc., and Today Systems, Inc.

programmers, and was involved in beta testing the developed software.

Petitioner chose to secure development funding through CPSG, Inc. In order to memorialize his indebtedness to CPSG, Inc., on October 1, 1995, petitioner signed an unsecured, interest-bearing promissory note in favor of CPSG, Inc. for an amount not to exceed $1.4 million. According to the terms of the note, petitioner is personally liable for the amounts expended by CPSG, Inc. up to the stated maximum ($1.4 million), the principal of which is due on October 1, 2005. The interest rate was set quarterly to the prime rate and was payable in annual installments beginning on December 31, 1996.

CPSG, Inc. did not have sufficient cash to advance all the research and development costs to which petitioner obligated himself. Accordingly, petitioner arranged for Uniplex Software, Inc.[10] (Uniplex Software) to lend funds to CPSG, Inc. Uniplex Software advanced to CPSG, Inc. a total of $1.15 million in payments of $750,000 and $400,000 on February 5 and July 11, 1996, respectively. On October 1, 1996, CPSG, Inc. executed a promissory note to memorialize the loans made by Uniplex Software, not to exceed $1.15 million. Pursuant to the terms of

---

[10]CPSG Ventures owned 50.1 percent of Uniplex Software, and IMI owned 49.9 percent. IMI is a United Kingdom publicly traded corporation. Petitioner owned 70 percent of CPSG Ventures, a general partnership, and Karan Erickson, an officer of CPSG, Inc., owned 30 percent.

the note, interest was set quarterly at the prime rate and was to be paid during the term of the note with the principal due on October 1, 2005.

Effective January 1, 1996, petitioner granted Uniplex Software a nonexclusive worldwide license for a renewable 3-year term to part of the developed technology.  Effective July 8, 1996, CPSG, Inc. and Uniplex Software entered into a Software License Agreement (source code license) whereby CPSG, Inc. provided Uniplex Software with a worldwide, perpetual, nonexclusive license to the InTEXT proprietary software.  In exchange, Uniplex Software covenanted to pay CPSG, Inc. $500,000 for the source code license, $350,000 initial license prepayment, and a 2-percent royalty on Uniplex Software's net revenue from the distribution of the software until CPSG, Inc. received $300,000, and thereafter a 1-percent royalty of the net revenue from distribution of the software.  The source code license provided Uniplex Software with security for the $1.15 million unsecured loan made to CPSG, Inc.

Annual sales of the InTEXT developed technology were approximately $1.5 million during the years at issue.  Annual sales of the Operating Control System developed technology were approximately $1 million for the subject years.  Annual sales of the Today developed technology approximated $2 million during the period 1995 through 1997.

During 1995 and 1996, CPSG, Inc., by and through its wholly owned subsidiaries, paid $67,543 and $1,361,006 of research and development costs on behalf of petitioner.  These costs included:

| Description | 1995 | 1996 |
|---|---|---|
| Salaries[1] | $28,584 | $1,076,850 |
| Contract labor | 20,947 | 46,451 |
| Building rent | 5,644 | 54,293 |
| Commissions | 4,250 | 3,306 |
| Telephone | 428 | 33,001 |
| Entertainment | 106 | 659 |
| Equipment rental | 6,052 | 68,379 |
| Repairs/maintenance | 1,036 | 26,086 |
| Freight | 497 | 265 |
| Janitorial | -0- | 426 |
| Recruiting fees | -0- | 4,187 |
| Travel | -0- | 3,016 |
| Services | -0- | 13,495 |
| Dues & subscriptions | -0- | 1,500 |
| Electricity | -0- | 14,218 |
| License fees | -0- | 12,050 |
| Small equipment | -0- | 573 |
| Office supplies | -0- | 1,761 |
| Postage/misc. | -0- | 491 |

[1]The category "Salaries" represents the cumulative amount paid to individuals living in Australia.

CPSG, Inc. used its accounting system to track these costs. CPSG, Inc. initially deducted these research and development costs on its Federal income tax return for the year ended September 30, 1996.  CPSG, Inc. subsequently amended its 1996 return eliminating the deduction.

Petitioners attached Schedules C for a computer software development business named "DMS Development Co." to their 1995 and 1996 returns.  For the years at issue, petitioners reported

no income on these Schedules C.  Petitioners deducted the

following research and development expenses on these schedules:[11]

| Description | 1995 | 1996 |
|---|---|---|
| Salaries | $28,584 | $1,076,850 |
| Contract labor | 20,947 | 46,451 |
| Building rent | 5,644 | 54,293 |
| Commissions | 4,250 | 3,306 |
| Telephone | 428 | 33,001 |
| Meals/entertainment | 106 | 329 |
| Equipment rental | 6,052 | 68,379 |
| Repairs/maintenance | 1,036 | 26,086 |
| Freight | 497 | 265 |
| Janitorial | -0- | 426 |
| Recruiting fees | -0- | 4,187 |
| Travel | -0- | 3,016 |
| Services | -0- | 13,495 |
| Dues & subscriptions | -0- | 1,500 |
| Electricity | -0- | 14,218 |
| License fees | -0- | 12,050 |
| Small equipment | -0- | 573 |
| Office supplies | -0- | 1,761 |
| Postage/misc. | -0- | 491 |
| Interest | -0- | [1]60,967 |
| TOTAL | [2]67,543 | 1,421,645 |

[1] The parties agree that $30,020 of this interest is not deductible on Schedule C, but it is deductible as investment interest.

[2] The parties stipulated that petitioners deducted $67,543 in research and development expenses.  However, the column totals to $67,544 and the notice of deficiency and petitioners' 1995 return state $67,534 as the amount deducted.

CPSG, Inc. paid the following amounts to petitioner as

minimum royalties pursuant to the development agreement:

| Date | Amount | For Period |
|---|---|---|
| 01/28/97 | $52,500 | 1/31/97 and 4/30/97 (Advance) |
| 03/31/97 | 105,000 | 6/30/97 - 3/31/98 |
| 12/30/98 | 78,750 | 6/30/98 - 12/31/98 |
| 12/20/99 | [1]108,150 | 3/31/99 - 12/31/99 |
| TOTAL | 344,400 | |

[1]The $108,150 amount included the royalty payment of $105,000 plus interest of $3,150 for the period 03/31/99 to 12/31/99.  On or about Aug. 1,

[11]The deduction of these research and development expenses in 1996 substantially eliminated an approximately $1.4 million capital gain realized from the sale of Unify Corp. stock.

1997, CPSG, Inc. informed petitioner that it was unable to make the minimum royalty payments under the development agreement.  The $3,150 is presumably accrued interest for the period of nonpayment of minimum royalties.

The $52,500 paid on January 28, 1997, included the January 31, 1997, minimum royalty payment as contemplated under the development agreement as well as an advance payment for the April 30, 1997, minimum royalty payment.

Petitioner paid CPSG, Inc. the following amounts as interest on his $1.4 million indebtedness to CPSG, Inc.:

| Date | Amount | For Period |
|------|--------|-----------|
| 12/29/96 | $30,947.27 | [1]10/1995 – 09/1996 |
| 03/31/98 | 138,541.27 | 10/1/96 – 12/31/97 |
| 12/30/98 | 117,092.59 | 1998 |
| 12/21/99 | 111,595.20 | 1999 |
| TOTAL | 398,176.33 | |

[1] For the period Oct. 1995 to Sept. 1996, the record fails to state the actual days upon which interest accrued.

Other Schedule C Expenses

On their Schedules C, petitioners reported the following amounts as receipts and expenses for a consulting business named "CPSG Ventures"[12] for the years at issue:

|  | 1994 | 1995 | 1996 |
|--|------|------|------|
| Receipts | $194,317 | $67,565 | $72,118 |
| Expenses | 79,881 | 30,912 | 79,349 |
| Net profit/loss | 114,436 | 36,653 | (7,231) |

The receipts reported for CPSG Ventures for 1994 on petitioners' Schedule C consisted of the following items:

CPSG, Inc. reimbursements[1]                    $61,640

---

[12]"CPSG Ventures" is the name of both a partnership in which petitioner was a general partner and petitioner's Schedule C business.  See supra note 10.

| | |
|---|---|
| CPSG, Inc. | [2]40,000 |
| Walker Interactive Systems[3] | 16,000 |
| Uniplex Software Systems, Inc. | 75,000 |
| Granite Bay Montessori reimbursements | 1,591 |
| Miscellaneous | 86 |
| TOTAL | 194,317 |

[1] Petitioner submitted expense reports to CPSG, Inc. for his travel and other expenses that he incurred on its behalf and CPSG, Inc. reimbursed him for these expenses.

[2] The $40,000 was for a charitable contribution made by CPSG, Inc. on behalf of petitioner.

[3] Petitioner was a member of the board of directors of Walker Interactive Systems.

The receipts reported for CPSG Ventures for 1995 on petitioners'

Schedule C consisted of the following items:

| | |
|---|---|
| CPSG, Inc. reimbursements | $53,187 |
| Walker Interactive Systems | 10,500 |
| Airline ticket refund | 3,878 |
| TOTAL | 67,565 |

The receipts reported for CPSG Ventures for 1996 on petitioners'

Schedule C consisted of the following items:

| | |
|---|---|
| CPSG, Inc. reimbursements | $53,618 |
| Walker Interactive Systems | 18,500 |
| TOTAL | 72,118 |

Petitioners claimed as deductions the following expenses on their

Schedules C for CPSG Ventures for the taxable years listed:

| Description | 1994 | 1995 | 1996 |
|---|---|---|---|
| Depreciation | $5,017 | $10,053 | -0- |
| Car & truck | -- | 5,799 | $5,807 |
| Interest | 386 | -- | -- |
| Legal/professional | 1,374 | 79 | 30 |
| Office expense | 905 | -- | 202 |
| Supplies | 970 | 865 | 12,604 |
| Travel | 54,644 | -- | 41,870 |
| Meals | 2,353 | 4,439 | 1,900 |
| Utilities | 9,995 | 9,457 | 16,861 |
| Auto-Std rate | 4,133 | -- | -- |
| Auto taxes | 104 | -- | -- |
| Miscellaneous | -- | 220 | 75 |
| TOTAL | 79,881 | 30,912 | 79,349 |

The above-listed expenses included amounts that were reimbursed by CPSG, Inc. for expenses such as travel and entertainment, supplies, and telephone. Additionally, these expenses included amounts not reimbursed by CPSG, Inc. In the notice of deficiency, respondent allowed deductions for expenses to the extent they were reimbursed by CPSG, Inc. Additionally, respondent allowed the car and truck expenses as itemized deductions.

## Charitable (Double) Deduction

On December 29, 1996, petitioners donated $60,000 to the Granite Bay Montessori School. On their 1996 income tax return, petitioners erroneously claimed a double deduction of $120,000. The parties have stipulated that petitioners are entitled to claim only a $60,000 charitable deduction with respect to the donation to the school for 1996. The only issue that remains with regard to this item is whether petitioners are liable for the accuracy-related penalty associated with the erroneous deduction.

### OPINION

Determinations of the Commissioner in a notice of deficiency are generally presumed correct, and the burden is on the taxpayer to show that the determinations are incorrect.[13] Rule 142(a);

---

[13]Sec. 7491 does not apply in this case to shift the burden of proof or production to respondent because the examination of
(continued...)

Welch v. Helvering, 290 U.S. 111, 115 (1933).  Deductions are a matter of legislative grace, and the taxpayer generally bears the burden of proving entitlement to such claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Furthermore, a taxpayer is required to maintain records sufficient to establish the amount of his income and deductions. Secs. 274(d), 6001; sec. 1.6001-1(a), (e), Income Tax Regs.

A.   Section 174--Research and Development Deductions

With regard to the claimed research and development (R&D) expenses for 1995 and 1996, the notice of deficiency states:

> Schedule C - DMS Loss
>
> | Year | 9512 | 9612 |
> |---|---|---|
> | Claimed on return | $67,534 | $1,421,645 |
> | Allowed per audit | -0- | -0- |
> | Adjustment | 67,534 | 1,421,645 |
>
> You have not shown that these expenses were ordinary and necessary expenses paid or incurred in connection with carrying on a trade of business.
>
> Since you have not established that the expenses claimed were paid or incurred for research and experimental expenditures in connection with your trade or business, they are not deductible.
>
> Loss is limited to amount of capital you have at risk.

---

[13](...continued) the returns at issue commenced before the statute's effective date.

To resolve this issue, we must look to the statute granting deductions for expenses related to R&D and the cases interpreting it. Section 174(a)(1) provides:

SEC. 174(a). Treatment as Expenses.--

(1) In general.--A taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.

To qualify for a deduction, the expenditures must be (1) qualifying, (2) paid or incurred in connection with the taxpayer's trade or business, and (3) reasonable. Sec. 174(e); sec. 1.174-2, Income Tax Regs. R&D expenditures which are not deductible under section 174(a) must be charged to a capital account. Sec. 1.174-1, Income Tax Regs.

The term "research or experimental expenditures" as used in section 174 means expenditures "incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory sense." Sec. 1.174-2(a)(1), Income Tax Regs. Section 174 allows a taxpayer to claim a deduction for expenditures paid or incurred for research carried on in his behalf by another person or organization. Sec. 1.174-2(a)(8), Income Tax Regs.

In this case, respondent does not argue or allege that the expenses in question are not "research and development costs in the experimental or laboratory sense" or that the amounts claimed

are unreasonable.  Respondent's position is that petitioner did not pay or incur the research expenses in connection with his own trade or business and that petitioner did not have the objective intent to prospectively enter into his own trade or business with the developed technology.

Petitioners argue that "There was a realistic prospect that * * * [petitioner] would enter a trade or business involving the software he developed."  (Emphasis added.)  Petitioners do not argue that at the time petitioner incurred the R&D expenses, he was already engaged in a trade or business; petitioners' focus is solely upon the prospective probability that petitioner would engage in a trade or business with the developed technology.[14] In its petition, CPSG, Inc. alleged that if the Court determines that Mr. and Mrs. Saykally are not entitled to the claimed R&D deductions, then CPSG, Inc. is so entitled.  CPSG, Inc. abandoned this argument. Ryback v. Commissioner, 91 T.C. 524, 566 n.19 (1988).  Therefore, we express no opinion as to this issue.

The Trade or Business Requirement

With respect to section 174, the U.S. Supreme Court has interpreted the trade or business requirement expansively.  Snow

_____

[14]Petitioners argue that petitioner was "capable of exploiting the new products;" "At the time the section 174 expenses were paid, there was a realistic prospect that petitioner would enter a trade or business involving the new * * * products;" and that he "intended to market the Developed Technology to new customers as well as existing customers of CPSG."  (Emphasis added.)

v. Commissioner, 416 U.S. 500 (1974). The Court held that section 174 allowed deductions for R&D expenditures not only for "on-going" and established businesses, but also for new businesses despite the fact that no trade or business was being conducted at the time the expenses were incurred.[15] Id.

This expansive interpretation allowing R&D deductions for expenses incurred prior to engaging in a trade or business is tempered by the requirement that there must be a "realistic prospect" that the taxpayer will subsequently enter into a trade or business utilizing the technology developed. Diamond v. Commissioner, 92 T.C. 423, 439 (1989), affd. 930 F.2d 372 (4th Cir. 1991); see I-Tech R&D Ltd. Pship. v. Commissioner, T.C. Memo. 2001-10, affd. sub nom. Lewin v. Commissioner, ___ Fed. Appx. ___ (4th Cir. 2003). "If those prospects are not realistic, the expenditures cannot be 'in connection with' a business of the taxpayer" so as to satisfy section 174. Spellman v. Commissioner, 845 F.2d 148, 149 (7th Cir. 1988), affg. T.C. Memo. 1986-403. "Whether activities in connection with a product

---

[15]In Commissioner v. Groetzinger, 480 U.S. 23, 36 (1987), the Court stated that to determine whether or not an income-producing endeavor constitutes a trade or business "'requires an examination of the facts in each case.'" (quoting Higgins v. Commissioner, 312 U.S. 212, 217 (1941)). "We accept the fact that to be engaged in a trade or business, the taxpayer must be involved in the activity with continuity and regularity and that the taxpayer's primary purpose for engaging in the activity must be for income or profit. A sporadic activity, a hobby, or an amusement diversion does not qualify." Id. at 35.

are sufficiently substantial and regular to constitute a trade or business" is a factual determination. I-Tech R&D Ltd. Pship. v. Commissioner, supra; see Green v. Commissioner, 83 T.C. 667, 687 (1984). However, in no event is a deduction appropriate where the taxpayer acts solely in an investor capacity. Green v. Commissioner, supra; see Higgins v. Commissioner, 312 U.S. 212 (1941); I-Tech R&D Ltd. Pship. v. Commissioner, supra; Universal Research & Dev. Pship. No. 1, et al. v. Commissioner, T.C. Memo. 1991-437.

Whether a taxpayer has a realistic prospect of using the fruits of R&D expenditures in a future business of his own involves a two-part test. "[A] taxpayer demonstrates such a [realistic] prospect by manifesting both the objective intent to enter such a business and the capability of doing so."[16] Kantor v. Commissioner, 998 F.2d 1514, 1518 (9th Cir. 1993), affg. in part and revg. in part T.C. Memo. 1990-380; see Zink v. United States, 929 F.2d 1015 (5th Cir. 1991); Spellman v. Commissioner, supra; Levin v. Commissioner, 832 F.2d 403, 406-407 (7th Cir. 1987), affg. 87 T.C. 698 (1986). Generally, in determining whether there is a "realistic prospect," we look solely to the period during which the expenditures were incurred. Kantor v.

[16]A taxpayer manifests his "capability" to enter into a business by his technical expertise to market the new technology and his financial ability to conduct the business. Scoggins v. Commissioner, 46 F.3d 950, 953 (9th Cir. 1995), revg. T.C. Memo. 1991-263.

Commissioner, supra at 1520 ("our inquiry is limited to the tax year in which a taxpayer incurs its research expenditure and claims the section 174 deduction"); Diamond v. Commissioner, 930 F.2d 372, 374-375 (4th Cir. 1991), affg. 92 T.C. 423, 439 (1989); Levin v. Commissioner, supra at 406 n.3 ("The tax treatment in 1979 depends on circumstances in 1979, not on what happened later").

"In order to qualify for the section 174 deduction, a taxpayer's existing or prospective business must be its own and not that of another entity." Kantor v. Commissioner, supra at 1519; see Levin v. Commissioner, supra; Green v. Commissioner, supra. There is a distinction drawn in tax law between engaging in one's own business and investing in a business of another. Kantor v. Commissioner, supra at 1519; see Whipple v. Commissioner, 373 U.S. 193, 202 (1963); Higgins v. Commissioner, supra at 218. When it appears "at the time of the research that a taxpayer's activities in connection with a new technology were unlikely to amount to any more than those of an investor, courts have denied the deduction." Kantor v. Commissioner, supra at 1519; see Zink v. United States, supra; Spellman v. Commissioner, supra; Levin v. Commissioner, supra; Diamond v. Commissioner, supra; I-Tech R&D Ltd. Pship. v. Commissioner, supra.

To determine whether the taxpayer manifests the objective intent to enter into a business of his own with the fruits of

R&D, we look to the facts and circumstances of the case. Of course, we examine any and all contracts and agreements in the record. See Kantor v. Commissioner, supra at 1519 (the "agreements, and other facts which existed at that time, sufficiently establish" that the taxpayer did not have the objective intent of entering into a business); Levin v. Commissioner, supra at 406. "[T]he 'right question' is 'whether the * * * [taxpayer] reasonably anticipated availing [itself] of the privileges [it] possessed on paper.'" LDL Research & Dev. II, Ltd. v. Commissioner, 124 F.3d 1338, 1345 (10th Cir. 1997) (quoting Levin v. Commissioner, supra at 406), affg. T.C. Memo. 1995-172. We must examine "the expectations of the parties". Levin v. Commissioner, supra at 406. "The legal entitlement must be backed by a probability of the firm's going into business. This ordinarily will be so only when it is in the venture's private interest to manufacture and sell any products that the development effort produces." Id. at 407. "Courts have repeatedly held that while the probability of a firm's going into its own business will satisfy section 174, the mere possibility of its doing so will not." Kantor v. Commissioner, supra at 1520.

At the time petitioner incurred the R&D expenditures, he did not have the objective intent to enter into a future business of his own with the developed technology. Rather, petitioner's

purpose for engaging in the R&D was to create the developed technology that could be licensed to CPSG, Inc. for use in CPSG, Inc.'s existing business.[17] For example, petitioner testified as follows:

> Q:   Okay.  And had no further development had taken place, what would have happened to CPSG?
>
> A:   It would have been literally out of business. Our [software] products would have been 1992 ilk. I'm sure you appreciate just reading the trade press how quickly technology moves in this industry, and it would have had obsolete products that they could no – not only could they not have sold them to any new customers, their own customer base would have immediately started looking for alternative technology.  A large part of the revenue for these companies came from customer support, customer upgrade kinds of revenue, and if they hadn't – if they hadn't had any improvement to the product, the customers would have no reason to spend that money, so CPSG would have simply been out of business.
>
> *       *       *       *       *       *       *
>
> Q:   How did you decide whether to do * * * [the development work] as an employee of CPSG or -- or as your Schedule C?
>
> A:   * * * I was concerned that CPSG really didn't have any leverage in a discussion with Computer Power Group.  If they cancelled the marketing agreement, if they cancelled the sublicense -- or the submarketer agreement, Computer -- CPSG was out of business.
>     So, my thought was to create some intellectual property ownership outside of Computer Power Software Group, and the idea being

---

[17]CPSG, Inc.'s initial return position was to deduct the R&D expenditures on its tax return.  CPSG, Inc. ultimately amended its return, eliminating the deduction, which petitioners then claimed on their individual tax return.

that, you know, you own the TV but I own the TV changer, so we better cooperate in resolving any differences.
And so that was the thought was to kind of create an ownership that I would have personally which would help us in protecting CPSG as well.

*       *       *       *       *       *       *

A:   * * * And again, having the intellectual property ownership in my hands personally meant at least we were going to have a discussion about it.

A corporate resolution passed by CPSG, Inc.'s board of directors stated that petitioner "may undertake such reasonable research and development activities on * * * [CPSG, Inc.'s] behalf in order to render and maintain the Company's products as commercially viable".  Indeed, on brief petitioners proposed that we find that "It was clear to petitioner that in order to save the business of CPSG more development had to be performed;" "Petitioner believed that by creating intellectual property rights outside of the CPSG/CPG/Syndicate relationship he would have more negotiating leverage regarding any technology that he developed;" and "Petitioner believed that if he had rights to the technology he developed and CPG had rights to the underlying technology, CPG and the Syndicates would have to cooperate with him."  On brief, petitioners explained that "When Syndicate funding ended, additional development had to be done for the business of CPSG to survive."

There is no evidence in the record, not even petitioner's testimony, that he intended to engage in a business of his own with the developed technology. "The fact that a taxpayer may have taken an active role in directing the research does not, by itself, place a taxpayer in a trade or business." I-Tech R&D Ltd. Pship. v. Commissioner, T.C. Memo. 2001-10 (citing Green v. Commissioner, 83 T.C. at 690). There is no evidence in the record of any specific plans or forecasts relating to the probability that petitioner might engage in the marketing of the developed technology. Id. There is no evidence that petitioner actually marketed the developed technology. Indeed, it would have been counterintuitive for petitioner to market the developed technology to outsiders; CPSG, Inc. was already an established software marketing entity with existing customers. All the publications and marketing materials relating to the developed technology were created on behalf of CPSG, Inc., not petitioner. If petitioner himself marketed the developed technology, he would be competing with his solely owned corporation. Indeed on brief, petitioners argued "CPSG was in absolutely the best position in the universe to market the * * * [Developed Technology]. Not only was it reasonable for petitioner to attempt to use CPSG to market the new products, it would have been asinine for him not to have done so."

The record does not demonstrate that petitioner's R&D activities amounted to anything more than the development of property rights that he intended to license to CPSG, Inc. for use in CPSG, Inc.'s business. As such, petitioner's activities amounted to nothing more than those of a prudent investor.[18] "'[T]he management of investments is not a trade or business for purposes of section 174." Spellman v. Commissioner, 845 F.2d at 150 (quoting Green v. Commissioner, 83 T.C. at 688).

For the aforesaid reasons, we find that at the time petitioner incurred the R&D expenditures, he did not have an objective intent to engage in his own trade or business with the developed technology.

Petitioners argue that the Court of Appeals for the Ninth Circuit's[19] opinion in Scoggins v. Commissioner, 46 F.3d 950 (9th Cir. 1995), revg. T.C. Memo. 1991-263, supports their contention that petitioner had a realistic prospect of using the R&D in a future business of his own. The facts in Scoggins are similar to the instant case in some respects. Both cases involve R&D where the person (in Scoggins a partnership) performed the R&D by

---

[18]There is no evidence of how much time petitioner devoted to this R&D endeavor. Clearly, petitioner monitored the R&D process via telephone, one visit to Australia, and electronic mail communications. However, petitioners do not allege, and we cannot find, that petitioner's activities during the time the R&D expenditures were made were sufficient to constitute a trade or business.

[19]To which this case is appealable.

contracting the work to others.  In both cases property rights to the technology resulting from the R&D were retained by the person or partnership responsible for performing the R&D and in both cases the owner of those property rights in the technology licensed the technology to a user in return for a royalty.  Both petitioner and the partners in Scoggins also had expertise in the type of technology that was the subject of the R&D.  Finally, in both cases it was clear that neither petitioner nor the partnership was engaged in a trade or business at the time that the R&D expenditures were paid or incurred.  Despite these similarities, we disagree that Scoggins is dispositive of the section 174 issue.

The primary focus of the Court of Appeals' opinion in Scoggins, does not appear to have been whether the taxpayers had the objective intent to enter into a business of their own with the fruits of the R&D expenditures. Indeed, after reciting the facts, the Court stated:

> There is no question that Scoggins and Christensen had the objective intent to enter into the business of marketing the reactor if the reactor proved successful.  The only question is whether they had a realistic prospect of engaging in the business as a partnership, or whether by virtue of the agreement with the corporation, they had deprived the partnership of the capability of doing so.  [Id. at 953.]

The Court of Appeals then analyzed the taxpayers' "capability" of engaging in a trade or business with the fruits of R&D.  In doing

so, the Court considered the taxpayers' technical expertise, their financial ability to conduct the business, and whether their contractual obligations precluded the likelihood of using the R&D in a future business.  Id.  The Court concluded that the taxpayers had the capability to use the R&D in a future business.[20]  In contrast, in the instant case we have found that petitioner failed the first part of the realistic prospect test because he had no objective intent to use the R&D in a future business of his own.

B.  Other Schedule C Expenses

In the notice of deficiency, respondent disallowed some of the expenses that petitioners claimed and deducted on their Schedules C for the taxable years 1994 and 1996.[21]  The amounts of the adjustments at issue are $18,241 and $25,731, respectively.  In the notice of deficiency, respondent claimed that petitioners had not "established a business purpose for the expenses claimed."

---

[20]There is a question whether petitioner had the right to use the developed technology.  His use may have depended upon the enforceability of the terms of the contract between CPG and CPSG, Inc. which petitioner testified could be canceled by CPG. Indeed, this potential problem was one of the reasons why petitioner decided to structure the R&D contract the way he did.

[21]Additionally, respondent determined that petitioners were entitled to deduct an additional $22,275 from their 1995 return. We presume 1995 is not at issue, since respondent allowed petitioners a greater deduction than was claimed.

Respondent argues that petitioners failed to substantiate the expenses deducted in excess of the amount allowed by respondent.[22] Petitioners argue that: (1) The notice of deficiency and respondent's court papers do not provide petitioners with notice of which expenses were denied, and (2) petitioners have sufficiently substantiated the deduction of expenses claimed. For the reasons detailed below, we believe petitioners failed to carry their burden.

Petitioner testified that he received payments for, inter alia, consulting services performed on behalf of CPSG Ventures.[23] Assuming this to be true, we find that petitioners have not proven entitlement to the disallowed deductions. We do not find petitioners' argument that respondent failed to identify which deductions were denied persuasive. Respondent allowed petitioners to deduct expenses to the extent that they received reimbursement from CPSG, Inc. Petitioners are in the unique position to know those expenses for which they received

[22]Respondent permitted deductions for reimbursed employee expenses to the extent such reimbursements were included in petitioners' Schedules C gross receipts for the years at issue. The amounts reimbursed by CPSG, Inc. were $61,640 and $53,618 for 1994 and 1996, respectively.

[23]For example, on their 1994 return, petitioners reported $194,317 in gross receipts for CPSG Ventures on which petitioners claimed an expense deduction of $79,881, leaving a net profit of $114,436. From the $79,881 in expenses claimed, respondent allowed $61,640 as a deduction, an amount equal to that which petitioners included in gross income as reimbursements received from CPSG, Inc.

reimbursement. The difference between the reimbursed expenses and the claimed expenses is the expenses for which respondent denied a deduction. The category of expenses denied becomes an important matter as the substantiation requirements vary depending upon the type of expense claimed as a deduction.

Generally, ordinary and necessary expenses paid or incurred in carrying on a trade or business are deductible by an individual engaged in the trade or business. Sec. 162(a); sec. 1.162-1(a), Income Tax Regs. "The determination of whether an expenditure satisfies the requirements of section 162 is a question of fact." Shea v. Commissioner, 112 T.C. 183, 186 (1999) (citing Commissioner v. Heininger, 320 U.S. 467, 475 (1943)).

Deductible expenses are subject to substantiation. Secs. 6001, 274(d). The basic substantiation requirement is set forth in section 6001 and provides in pertinent part:

> SEC. 6001. NOTICE OR REGULATIONS REQUIRING RECORDS, STATEMENTS, AND SPECIAL RETURNS.
>
> Every person liable for any tax imposed by this title, or for the collection thereof, shall keep such records * * * and comply with such rules and regulations as the Secretary may from time to time prescribe. * * *

The regulations provide that "any person subject to tax * * * shall keep such permanent books of account or records * * * as are sufficient to establish the amount of * * * deductions." Sec. 1.6001-1(a), Income Tax Regs. In the event that a taxpayer

establishes that deductible expenses have been paid, but he is unable to substantiate the precise amount, the court may estimate the amount of such deduction bearing heavily against the taxpayer. Cohan v. Commissioner, 39 F.2d 540, 543-44 (2d Cir. 1930). However, the court cannot make such an estimate unless the taxpayer presents sufficient evidence to provide a reasonable basis upon which to make the estimate. Vanicek v. Commissioner, 85 T.C. 731, 743 (1985).

The court's ability to estimate reasonably the amount of a deduction is curtailed in the case of certain classes of expenses. Section 274(d) limits the Court's estimating ability. Sanford v. Commissioner, 50 T.C. 823, 827 (1968), affd. per curiam 412 F.2d 201 (2d Cir. 1969); see Golden v. Commissioner, T.C. Memo. 1993-602. Section 274(d) provides:

> SEC. 274(d) Substantiation Required.--No deduction or credit shall be allowed--
>
> > (1) under section 162 or 212 for any traveling expense (including meals and lodging while away from home),
> >
> > (2) for any item with respect to an activity which is of a type generally considered to constitute entertainment, amusement, or recreation * * *
> >
> > (3) for any expense for gifts, or
> >
> > (4) with respect to any listed property (as defined in section 280F(d)(4)),
>
> unless the taxpayer substantiates by adequate records or by sufficient evidence corroborating the taxpayer's own statement * * *. [Emphasis added.]

See sec. 1.274-5T, Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). As applicable here, "listed property" includes expenses associated with computer equipment and cellular telephones. Sec. 280F(d)(4).

To substantiate a deduction under section 274(d), a taxpayer must maintain adequate records or present other corroborative evidence to show, inter alia, the amount of the expense, the date upon which it was incurred, and the business purpose for the expenditure. Sec. 1.274-5T(b), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985). To substantiate a deduction by means of adequate records, the taxpayer must present some type of documentary evidence. Sec. 1.274-5T(c)(2)(i), Temporary Income Tax Regs., 50 Fed. Reg. 46017 (Nov. 6, 1985).

The parties stipulated that reimbursements received from CPSG, Inc. were "primarily" for travel and entertainment, supplies, and telephone expenses. Respondent allowed as a deduction the full amount of the expenses associated with the reimbursements. Additionally, respondent allowed petitioners to deduct their automobile expenses as an itemized deduction.

The substantiation requirements of sections 6001 and 274(d) require, at a minimum, that petitioners substantiate the expenses deducted. Some of the items for which deductions were claimed

are section 280F(d)(4) "listed property".[24]  These items, as previously stated, require strict substantiation.  Here, petitioners failed to detail the expenses denied, the amounts of those expenses, and the business purpose for those expenses.  We are not required to, and shall not, guess.

Petitioners have failed to substantiate sufficiently the expenses claimed in excess of the amount respondent allowed in the notice of deficiency.  Furthermore, petitioner's vague testimony that all the expenses claimed were for business purposes is not sufficient.  "It is well settled that we are not required to accept petitioner's self-serving testimony in the absence of corroborating evidence."  Jacoby v. Commissioner, T.C. Memo. 1994-612 (citing Lerch v. Commissioner, 877 F.2d 624, 631-632 (7th Cir. 1989), affg. T.C. Memo. 1987-295); see Geiger v. Commissioner, 440 F.2d 688, 689 (9th Cir. 1971), affg. per curiam T.C. Memo. 1969-159; Niedringhaus v. Commissioner, 99 T.C. 202, 212 (1992).  "There must be sufficient evidence in the record to permit the Court to conclude that a deductible expense was incurred in at least the amount allowed."  Jacoby v. Commissioner, supra (citing Williams v. United States, 245 F.2d 559, 560 (5th Cir. 1957)) (emphasis added).  To permit

---

[24]Petitioner testified that part of the deductions claimed and disallowed were for computer equipment and cellular telephone.  See sec. 280F(d)(4)(A)(v); Vaksman v. Commissioner, T.C. Memo. 2001-165; Nitschke v. Commissioner, T.C. Memo. 2000-230.

petitioners a deduction for the amounts shown on their 1994 and 1996 returns, without definitive evidence showing the amounts expended and the purposes of the expenditures, would be "unguided largesse". See Jacoby v. Commissioner, supra.

Since petitioners failed to identify their deductions and the specific amounts, the knowledge of which is unique to them, we uphold respondent's determination that petitioners are not entitled to claim deductions in excess of those amounts determined in the notice of deficiency.

## C. Accuracy-Related Penalties

Respondent determined penalties pursuant to section 6662 in the amounts of $2,346, $3,354, and $126,858 for the taxable years 1994, 1995, and 1996, respectively. Respondent based his determination on negligence or disregard of the tax rules and regulations and/or a substantial understatement of income tax. Respondent's determination is presumed correct, and the burden lies with petitioners to demonstrate that respondent's penalty determination was in error.[25] Rule 142(a).

Section 6662(a) imposes a 20-percent penalty on the portion of an underpayment of tax attributable to, inter alia, negligence and/or a substantial understatement of income tax. Sec. 6662(a) and (b). "Underpayment" is defined as the amount by which the tax imposed exceeds the excess of the sum of the amount shown by

---

[25]See supra note 13.

the taxpayer on his return plus the amounts not so shown previously assessed (or collected without assessment) over the amount of rebates made.  Sec. 6664(a).

"Negligence" is defined as "any failure to make a reasonable attempt to comply with the provisions of this title" and "disregard" means "any careless, reckless, or intentional disregard."  Sec. 6662(c).  Similarly, caselaw defines negligence as a lack of due care or "'the failure to do what a reasonable and ordinarily prudent person would do under the circumstances.'" Freytag v. Commissioner, 89 T.C. 849, 887 (1987) (quoting Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. on this issue 43 T.C. 168 (1964) and T.C. Memo. 1964-299)), affd. 904 F.2d 1011 (5th Cir. 1990), affd. 501 U.S. 868 (1991). Pursuant to the regulations, "'Negligence' also includes any failure by the taxpayer to keep adequate books and records or to substantiate items properly."  Sec. 1.6662-3(b)(1), Income Tax Regs.

There is a "substantial understatement" of tax if "the amount of the understatement for the taxable year exceeds the greater of" (1) 10 percent, or (2) $5,000.  Sec. 6662(d)(1)(A). An "understatement" means the excess of the amount of tax required to be shown on the return for the year over the amount of tax shown on the return.  Sec. 6662(d)(2)(A).  However, as applicable here, the amount of the understatement is reduced by

that portion of the understatement which is attributable to any item if the relevant facts affecting the item's tax treatment are adequately disclosed on the return or a statement attached to the return and there is a reasonable basis for the tax treatment of such item.  Sec. 6662(d)(2)(B).

Section 6664(c) provides an exception to the penalty imposed under section 6662(a).  "No penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." Sec. 6664(c)(1).  The determination of whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, contemplating all of the relevant facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.

With respect to the deduction of R&D expenses, we cannot find under the facts before us that petitioners acted unreasonably by claiming the section 174 deductions.  The facts of this case are unique, and petitioner testified that he relied upon the advice of a tax professional.  See id.  Accordingly, penalties associated with such deductions are not appropriate.

With respect to the penalties relating to the other disallowed deductions claimed on petitioners Schedules C for the tax years 1994 and 1996, petitioners failed to substantiate the deductions claimed.  As previously stated, petitioners are in the

unique position to determine for which expenses CPSG, Inc. reimbursed them. The balance are those deductions which respondent denied. Incomplete copies of credit card statements and petitioner's self-serving testimony are not sufficient to substantiate the deductions claimed. Accordingly, petitioners have failed to demonstrate that they were not negligent in claiming these disallowed deductions. Xuncax v. Commissioner, T.C. Memo. 2001-226; see sec. 1.6662-3(b)(1), Income Tax Regs.

Lastly, we turn to whether a penalty is appropriate due to the double charitable contribution deduction claimed by petitioners on their 1996 return. The evidence demonstrates that petitioners made a mistake in preparing their 1996 return. On brief, petitioners argued that, relying upon Rev. Proc. 96-58, 1996-2 C.B. 390, they had made adequate disclosure of the charitable contribution deduction by completing the charitable contribution portion of Schedule A, Itemized Deductions. Rev. Proc. 96-58, supra, provides that additional disclosure of facts is not necessary to fall within the auspices of section 6662(d)(2)(B), which allows for the reduction in the amount of the understatement, provided that the forms and attachments are completed in a clear manner and in accordance with their instructions. Rev. Proc. 96-58, sec. 4.01, supra. Although Rev. Proc. 96-58 is applicable to whether a taxpayer has disclosed sufficient facts to be entitled to reduce the amount of the

understatement, it "does not apply with respect to any other penalty provision (including the negligence or disregard provisions of the §6662 accuracy-related penalty)."  We agree with respondent that a prudent taxpayer would have been warned of a potential problem with his return by an additional $60,000 deduction.  Thus, we find that respondent's imposition of a penalty for an erroneously claimed double deduction was substantially justified.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.

Reporter's Note: This report was modified by Order dated Sept. 4, 2003.