Filed:  May 14, 2003

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

———————————

No. 02-1169
(Tax Ct. No. 97-20561)

———————————

Nathan Lewin, etc.,

                              Petitioner - Appellant,

          versus

Commissioner of Internal Revenue,

                              Respondent - Appellee.

———————————

O R D E R

———————————

The court amends its opinion filed March 26, 2003, as follows:

On the cover sheet, section 1 -- the status is changed from "UNPUBLISHED" to "PUBLISHED."

On the cover sheet, section 6 -- the status is changed to read "Affirmed by published per curiam opinion."

On page 2, section 2 -- the reference to use of unpublished opinions as precedent is deleted.

                              For the Court - By Direction


                              /s/ Patricia S. Connor
                              Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NATHAN LEWIN, a partner other than
the tax matters partner,
    *Petitioner-Appellant,*

    and

I-TECH R&D LIMITED PARTNERSHIP,        No. 02-1169
    *Petitioner,*

    v.

COMMISSIONER OF INTERNAL REVENUE,
    *Respondent-Appellee.*

Appeal from the United States Tax Court.
(Tax Ct. No. 97-20561)

Argued: December 4, 2002

Decided: March 26, 2003

Before GREGORY, Circuit Judge, Joseph R. GOODWIN,
United States District Judge for the
Southern District of West Virginia,
sitting by designation, and James H. MICHAEL, Jr.,
Senior United States District Judge for the
Western District of Virginia, sitting by designation.

Affirmed by published per curiam opinion.

**COUNSEL**

**ARGUED:** Nathan Lewin, LEWIN & LEWIN, Washington, D.C.,
for Appellant. Rachel Ida Wollitzer, Tax Division, UNITED STATES

DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Alyza D. Lewin, LEWIN & LEWIN, Washington, D.C., for Appellant. Eileen J. O'Connor, Assistant Attorney General, Thomas J. Clark, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

_____

_____

## OPINION

PER CURIAM:

Petitioner-Appellant Nathan Lewin appeals from the decision of the United States Tax Court holding that petitioner's deductions for research and development expenses do not satisfy the requirements of § 174(a)(1) of the Internal Revenue Code. Jurisdiction in this court is invoked pursuant to 26 U.S.C. § 7482. After carefully considering the record, the briefs, and the parties' arguments, this court affirms the United States Tax Court's ruling.

### I.

Appellant Lewin was a partner in I-Tech R&D Limited Partnership [hereinafter "I-Tech"]. For tax years 1984 through 1986, I-Tech claimed deductions for research and development expenses pursuant to § 174(a)(1) of the Internal Revenue Code.[1] The Commissioner disallowed the deductions, and Lewin, a partner other than the tax matters partner, filed a petition for readjustment of partnership items with

_____

[1] 26 U.S.C.A. § 174(a)(1) (West 1994 & Supp. 2002) provides:

> A Taxpayer may treat research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditures so treated shall be allowed as a deduction.

2

the United States Tax Court pursuant to I.R.C. § 6226(b). (Appellee's Br. at 3.) After a trial, the Tax Court issued an opinion holding that I-Tech was not entitled to the deductions, and the instant appeal followed. (J.A. 902-32.) At issue is whether the Tax Court properly disallowed the deductions because the partnership's expenditures were not done "in connection with" the operation of the partnership's trade or business, and because the partnership did not have a "realistic prospect" of exploiting any new discoveries or technology in a trade or business related to those discoveries.

### A. *Factual Background*

I-tech, a Maryland limited partnership organized in 1984, had three general partners: 1) Professor Itzhak Yaakov; 2) Capital Corporation of Washington, owned by Robert E. Slavitt; and 3) Lloyd Levin. (J.A. 904.) Mr. Yaakov and Mr. Slavitt formed I-Tech to fund research and development ["R&D"] projects of five startup Israeli companies. (J.A. 905.) The partnership's Confidential Private Placement Memorandum [hereinafter "PPM"] informed prospective investors that the five Israeli companies would perform the actual research, while I-Tech would provide funding for the research projects. *Id*. The companies, Oshap Technolgies, Ltd., Efrat Future Technology, Ltd., AiTech Systems, Ltd., Hal Robotics, Ltd., and Cycon, Ltd., conducted research in computer robotics and related fields.[2] (J.A. 906.) I-Tech financed the five R&D projects with proceeds from the sale of the limited partnership interests and from a commercial loan from the Israel General Bank, Ltd. (J.A. 910.)

Significantly, I-Tech did not set aside any funds to manufacture or market products developed by the R&D companies. In contrast, the

---

[2] Specifically, Oshap was researching robots and robotic production lines to develop technology that would allow a manufacturer to simulate a production line on a computer screen. (J.A. 906.) Efrat was developing a digital voice message storage and retrieval system. *Id*. AiTech was developing a "ruggedized" computer that can be operated under extreme environmental conditions. *Id*. Hal Robotics was researching an automated process for engineering and producing a product by robots. (J.A. 907.) Finally, Cycon was developing a computer and software to control a machine that would automatically mill metal parts.

PPM contained detailed information about the marketing plans developed by each of the R&D companies, as well as the activities already undertaken by each company. (J.A. 309, 310, 315-16, 318-19, 323-24.)

The partnership entered into a separate agreement with each of the five companies. Under the agreements, I-Tech had certain rights, title, and interest in the R&D companies' existing and future technology. (J.A. 911.) In exchange for a fee and royalty payments, each R&D company had a nonexclusive license to use the technology before completing its R&D project. (J.A. 912.) The partnership also granted the R&D companies a limited nonexclusive license for the commercial exploitation of any new technology developed by the R&D projects.[3] (J.A. 463, 513, 561, 590, 592, 912.) During these periods, the partnership was to receive royalties from the commercial exploitation of the products. *Id*. With the exception of Cycon, each of the R&D companies had an option to acquire all rights, title, and interest in the technology it developed. If a R&D company exercised its buy-out option, the partnership could acquire an equity interest in the R&D company. (J.A. 913.)

I-Tech contracted with Robots & Software International, Inc. [hereinafter "RSI"] to receive technical and other consulting services on how best to exploit the results of the R&D projects. (J.A. 908.) Additionally, the partnership hired WorldTech Israel, Ltd. [hereinafter "WorldTech"] to provide I-tech with management, financial, and consulting services. (J.A. 909.)

The research agreements with the R&D companies contained a prohibition, imposed by the Israeli government, against the manufacture of any products using the results of the R&D projects outside of

---

[3] With respect to Efrat, AiTech, Hal Robotics, and Cycon, the nonexclusive licensing periods for exploitation of the research began after the research was completed, and was to run "until specified levels of royalties had been received, or until either I-Tech exercised certain rights to acquire equity in [the four companies], or, in the case of Efrat, AiTech, and Hal Robotics, until the R&D companies elected" to exercise their buy-out options. (J.A. 912.) Oshap's nonexclusive licensing period ran for six months and one day after the completion date. *Id*.

4

Israel without the prior written consent of the Israeli government's office of the Chief Scientist. (J.A. 913.) The consent of the Chief Scientist was not assured. (J.A. 288.) Finally, if the technology resulting from the projects was not commercialized within five years of the completion date, the rights to the technology transferred to the Israeli government. (J.A. 914.)

## B. *The Tax Court's Opinion*

After a one day trial, and a review of the record, the Tax Court held that I-Tech was not entitled to the R&D deductions claimed for 1984 through 1986. The Tax Court recognized that case law clearly establishes that § 174(a)(1) does not require the taxpayer actually to be engaged in a trade or business at the time of the expenditure. *Snow v. Comm'r*, 416 U.S. 500 (1974); *Cleveland v. Comm'r*, 297 F.2d 169 (4th Cir. 1961). However, to qualify for a deduction under § 174, the expenditure must still be "in connection" with the taxpayer's trade or business. Specifically, there must be a "realistic prospect" at the time of the expenditure that the partnership will enter a trade or business involving the technology being developed. *Diamond v. Comm'r*, 930 F.2d 372, 374-75 (4th Cir. 1991); *LDL Research & Dev. II, Ltd. v. Comm'r*, 124 F.3d 1338, 1345 (10th Cir. 1997); *Kantor v. Comm'r*, 998 F.2d 1514, 1518 (9th Cir. 1993) ("We hold that a taxpayer demonstrates such a prospect by manifesting both the objective intent to enter such a business and the capability of doing so."); *Zink v. United States*, 929 F.2d 1015, 1023 (5th Cir. 1991); *Spellman v. Comm'r*, 845 F.2d 148, 149 (7th Cir. 1988).

The Tax Court first determined that I-Tech's involvement with the five R&D companies did not rise to the level of control or management required to indicate that the R&D was done in connection with I-Tech's trade or business. The Tax Court rejected the petitioner's argument that Mr. Slavitt's and Yaakov's initial inspection tours of the companies, their subsequent visits to the companies, and their numerous conversations with personnel at WorldTech, RSI, and the R&D companies, establishes active involvement with the R&D companies. The Tax Court characterized the actions of Mr. Slavitt and Mr. Yaakov as activities undertaken on behalf of I-Tech in its role as investor in the R&D companies. (J.A. 921-22.) In reviewing the record and the testimony, the court found that the "majority of Mr.

5

Slavitt's and Mr. Yaakov's efforts was spent trying to assure I-Tech its stream of `royalty' income." (J.A. 922.) Furthermore, the court below noted that an active role in directing the R&D is not by itself sufficient to place the taxpayer in a trade or business for purposes of § 174. (J.A. 922-23.) Because the partnership did not have contractual control over the research, it was merely an investor, and therefore, was not engaged in a trade or business with regard to the R&D activities. *Id*.

The Tax Court further found that the partnership did not have a "realistic prospect" of entering any trade or business involving technology created from the R&D projects. First, the Tax Court noted that the PPM did not contain any specific plans for I-Tech to market any discoveries, or to hire staff with experience in marketing the technology anticipated to emerge from the R&D projects. In fact, the PPM spells out the marketing and manufacturing plans of each R&D company, but fails to specify how I-Tech planned on being involved in the manufacturing and marketing of any discoveries. (J.A. 924-25.) Second, in reviewing the record, the Tax Court concluded that "the plan from the beginning was for the R&D companies to exercise their buy-out options and for I-Tech to exercise its equity options in the R&D companies or their affiliates." (J.A. 925.)

The Tax Court also noted that the buy-out options of the R&D companies almost certainly assured that I-Tech did not have a realistic prospect of exploring any discoveries. The options had only a minimal waiting period, and economic reality almost guarantees that if the new technology is going to be profitable, the R&D companies would exercise those options. (J.A. 927.) Finally, the Tax Court found that the restrictions imposed by the Israeli Government also seriously undermined the partnership's ability to exploit the products.

The Tax Court concluded that the partnership did not have "any realistic prospect . . . [to] exploit any discoveries in a trade or business," and that "I-Tech served as a financing vehicle set up to fund five Israeli R&D companies in exchange for a stream of royalty payments convertible into equity interests in the R&D companies or their affiliates." (J.A. 928.)

6

II.

The parties disagree as to the proper standard this court must apply in reviewing whether the Tax Court correctly held that I-Tech's expenditures could not be deducted under § 174(a)(1). If resolving this issue is a question of fact, then the court cannot disturb the Tax Court's decision unless it is clearly erroneous. However, if determining whether the partnership's expenditures qualify for a § 174(a)(1) deduction involves a mixed question of fact and law, then the court should perform *de novo* review. *Estate of Waters v. Comm'r*, 48 F.3d 838, 841-42 (4th Cir. 1995) (noting that in reviewing Tax Court decisions, the court of appeals reviews factual findings under the clearly erroneous standard, but questions that "require the consideration of judgment about the values underlying legal principles" are reviewed *de novo*). The court need not directly address this issue, however, because it will affirm the Tax Court's decision in the instant case under either standard of review.[4]

---

[4] It is important to note that in *Diamond v. Comm'r*, 930 F.2d 372 (4th Cir. 1991), the court addressed the identical issue that is currently before the court. Although the court did not specifically discuss the applicable standard of review, it did reference the clearly erroneous standard after summarizing the Tax Court's various findings. *Diamond*, 930 F.2d at 376 (noting that "[u]nder the applicable standard of review, it cannot be said that the findings of the Tax Court are clearly erroneous"); *see also Harris v. Comm'r*, 16 F.3d 75, 81 (5th Cir. 1994) ("We must determine whether the Tax Court was clearly erroneous in finding that . . . there was a realistic prospect that the Partnership, instead of CemCom, would engage in the licensing of the cement technology."). *But cf. LDL Research & Dev. II, Ltd. v. Comm'r*, 124 F.2d 1338, 1342 (10th Cir. 1997) ("The court's ultimate determination that the partnership's expenditures were not research or experimental expenditures in connection with a trade or business involves the application of law to fact, and calls for de novo review by this court.") (internal quotation marks and alterations omitted); *Scoggins v. Comm'r*, 46 F.3d 950, 952 (9th Cir. 1995) ("But the Tax Court's ultimate determination that the partnership's expenditures were not `research or experimental expenditures . . . in connection with a trade or business' involves the application of law to fact, and calls for *de novo* review by this court."); *Zink v. United States*, 929 F.2d 1015, 1020-21 (5th Cir. 1991) ("Whether the Zinks' investment was in their own `trade or business' is a question that involves the application of law to facts. We review the district court's factual findings, including reasonable inferences that may be drawn therefrom, under the clearly erroneous standard, but review de novo the application of the law to those facts.") (internal quotations marks and alterations omitted).

7

Petitioner argues that because I-Tech controlled the R&D of the five Israeli companies, the partnership's expenditures were "in connection with" the partnership's trade or business, and therefore, are deductible under § 174. Specifically, I-Tech argues that the R&D projects of the five Israeli companies were under the personal direction and control of the I-Tech general partners. (Appellant's Br. at 31-38.) Appellant references Mr. Slavitt's and Mr. Yaakov's active involvement with the five R&D companies. In particular, appellant cites the initial inspection tours of the five Israeli companies, the daily conversations with personnel at WorldTech and the heads of the R&D companies, and Yaakov's business dealings with Cycon. *Id*. Appellant argues that this involvement with the R&D companies establishes that the partnership was not simply a passive investor.

Appellee, on the other hand, argues that the activities of the partners constituted management of an investment and are not sufficient to establish that the R&D expenditures were incurred in connection with a trade or business. Appellee stresses that the R&D companies, and not I-Tech, had exclusive control of the R&D projects. (Appellee's Br. at 56.) Appellee argues that the activities of the I-Tech partners amount to monitoring and supervision of the R&D projects, and not to direction and control of those projects. (Appellee's Br. at 57.)

A close review of the facts in the case, however, reveals that I-Tech was merely an investor in the five R&D companies, and was not engaged in a trade or business related to the R&D projects. None of the actions undertaken by Mr. Slavitt or Mr. Yaakov can be considered anything more than two very interested and capable investors monitoring their investment and doing what they could to assure that it was a successful venture. For example, even though Slavitt's testimony states that sometimes the partnership knew of the direction of the companies' research and development, and would communicate information that might be beneficial to the ultimate outcome of the project (Appellant's Br. at 35), there is absolutely no indication that I-Tech had any authority to direct the R&D in a certain direction. The lack of actual control over the R&D projects precludes the court from finding that the partnership was engaged in a trade or business related to the R&D activities. *See LDL Research & Dev.*, 124 F.3d at 1343 (noting that the "primary determinant between involvement and investment was the degree of taxpayer control over, or regular and

8

substantial participation in, the project in question"); *Nickeson v. Comm'r*, 962 F.2d 973, 978 (10th Cir. 1992) ("To establish that claimed § 174 expenses were in connection with their trade or business, taxpayers must show both a profit motive and that their activities were substantial and regular enough to establish that they were actively involved in the trade or business.").

Mr. Slavitt and Mr. Yaakov's involvement simply does not exceed that of an interested and active investor. As the Ninth Circuit recognized in *Kantor v. Commissioner*, 998 F.2d 1514 (9th Cir. 1993), a case with substantially similar facts as the instant case, even when one of the partners becomes more seriously involved with the R&D company, that, by itself, is not "indicative of an intent or capability of the partnership to enter into a trade or business of its own." *Kantor*, 998 F.2d at 1520. Because the appellant places substantial emphasis on the activities undertaken by Mr. Yaakov, and because those activities are very similar to the ones at issue in *Kantor*, it is worth quoting the Ninth Circuit's conclusion at length:

> Hubert's [partner] identification of a marketable technology, his formation of a partnership to fund its development, and his negotiation of agreements under which other entities would develop and market it amount to the promotion and protection of a technological investment, not a business. Although Hubert provided technical information and advice to those individuals developing the software, those individuals were under the management and control of the research firm . . . not the partnership. Hubert's activities with the research firm on behalf of the partnership were consistent with those of any investor who applies his knowledge and experience to insure that an investment is successful; his activities did not indicate that the partnership was engaged in a trade or business or was ever designed to do so.

*Id*. Similarly, the Court of Appeals for the Fifth Circuit found that partners that received reports, kept up with the progress of the research project, visited the R&D plant on an occasion, and attended an exhibition of the research project indicated "nothing more than that they were interested investors keeping up with the progress of their investment." *Zink*, 929 F.2d at 1022. The court concluded that

9

"[t]hese activities were insufficient, *as a matter of law*, to establish that the Zinks were in that trade or business for the purposes of section 174." *Id.* We find nothing in the record currently before us to distinguish the instant case from *Kantor* and *Zink*, and therefore, find that I-Tech's expenditures were not made "in connection with" a trade or business within the meaning of § 174.

## III.

Appellant further asserts that even if at the time of the deductions the partnership was not engaged in a trade or business connected to the R&D projects, I-Tech had a "realistic prospect" of exploiting any products or technology derived from the R&D projects. In support of its argument, appellant relies on I-Tech's numerous statements in the PPM that the partnership intends to exploit any inventions or new products that emerge from the R&D companies. (Appellant's Response Br. at 4-5.) Furthermore, appellant emphasizes that the five R&D companies were essentially start-up companies that lacked "any experience in commercial exploitation of a product resulting from the research and development activities." (J.A. 273.) Appellant also stresses that the restrictions imposed by the Israeli government would not inhibit the production and marketing of any new technology or product in the United States because the restrictions were standard and almost never enforced. (Appellant's Br. at 42.) Finally, the appellant asserts that the buy-out options of the five R&D companies simply protected the companies, and were not an indication that the companies, and not I-Tech, would exploit any results from the research projects. (Appellant's Response Br. at 6-7.)

In contrast, Appellee argues that the Tax Court correctly found that I-Tech did not have a realistic prospect of entering a trade or business in connection with the fruits of the R&D projects. Appellee asserts that the buy-out options held by the R&D companies establish that I-Tech lacked the intention and capability to exploit the results of the research projects. After all, common sense and economic reality dictate that the companies will exercise the buy-out options if the research results yield any significant commercial potential. (Appellee's Br. at 36.) Appellee also stresses that I-Tech did not have any specific plans, funds, infrastructure, or experience to exploit any technology that emerged from the research. (Appellee's Br. at 41-47.)

10

Finally, appellee notes that the partnership lacked any assurance that the Israeli government would approve the manufacture and development of any derived products outside of Israel.

The Tax Court's conclusion that I-Tech did not have a realistic prospect of exploiting any discoveries in a trade or business is supported by all of the evidence, and appellant's conclusory statements to the contrary do not satisfy their burden of establishing such a prospect. To demonstrate a "realistic prospect" of entering its own business in connection with the fruits of the research and development, the taxpayer must "manifest[] both the objective intent to enter such a business and the capability of doing so." *Kantor*, 998 F.2d at 1518. Significantly, for purposes of § 174, the taxpayer's prospective business must be its own and not that of another entity. *Id*. at 1519. As this court has previously stated, the "question is not whether it is possible in principle, or by further contract, for the[] partnership[] to engage in a trade or business, but whether, in reality, the project partnership . . . possessed the capability in the years before the court to enter into a new trade or business in connection with" the fruits of the proposed research and development projects. *Diamond*, 930 F.2d at 375.

It is obvious from reading Appellant's briefs and the PPM that the partnership expressed the intent to "seek to exploit commercially" the results of the five companies' R&D projects. However, a closer examination of the record reveals that the partnership's intent was simply to secure royalty payments and equity interests in the five R&D companies, and not to engage in any trade or business of its own. Contrary to appellant's assertions, the Tax Court did not brush aside the testimony at trial or the statements in the PPM. Rather, the court looked beyond the conclusory nature of I-Tech's statements and explored the economic realities and facts surrounding the partnership's agreement with and involvement in the R&D companies. Significantly, the record clearly shows that I-Tech did not have specific plans or resources to exploit or market the results of the research projects. In fact, the partnership's own "PPM sets forth the marketing and manufacturing plans for each R&D company and describes in detail which R&D company or third party will carry out each function." (J.A. 924.)

Furthermore, the buy-out options of the R&D companies almost certainly guaranteed that the partnership did not have a realistic pros-

11

pect of exploiting any discoveries in its own trade or business. As this court previously recognized in the *Diamond* case, sound economic reality and judgment dictates that if there is any profit to be made by the results of the R&D, the five Israeli companies would exercise their buy-out options and exploit the technology on their own. *See Diamond*, 930 F.2d at 375 (noting that "if a money-making business should materialize, there exists no reasonable expectation that Elco [the R&D company] will permit it to be exploited by one of the partnerships"). Appellant tries to distinguish *Diamond* because, unlike the five start-up companies in the instant case, the R&D company in *Diamond* had the infrastructure, experience, and resources necessary to exploit the technology. However, appellant forgets that even if the five R&D companies lack the experience, infrastructure, or resources to exploit their products on their own, the same can be said of I-Tech. Additionally the PPM shows that the R&D companies, and not I-Tech, had taken steps to plan for the manufacture and marketing of any newly developed technology. Thus, while it is always possible that I-Tech was going to develop its own trade or business to exploit the technology, it was not probable that I-Tech would do that. *See Kantor*, 998 F.2d at 1520 ("Courts have repeatedly held that while the probability of a firm's going into business will satisfy section 174, the mere possibility of its doing so will not.") (citing *Diamond*, 930 F.2d at 375); *see also LDL Research*, 124 F.3d at 1345 ("[T]he bare contractual right to enter such a business does not entitle the taxpayer to a § 174(a)(1) deduction. Rather, the right question is whether the partnership reasonably anticipated availing itself of the privileges it possessed on paper.") (internal quotations and citations omitted).

Finally, the restrictions by the Israeli government seriously undermined I-Tech's prospect of entering its own trade or business in connection with the results of the R&D projects. Even considering Mr. Yaakov's testimony that those restrictions were only a formality, and that there was a high likelihood that Israel's Chief Scientist would permit the manufacture of any product outside of Israel if there is a profit to be made, I-Tech did not have any assurance that permission would be granted. Although Mr. Yaakov's experience and knowledge may be substantial in this area,[5] his testimony was simply conjecture

---

[5] Mr. Yaakov served as chief of research and development in the Israel Defense Forces. (J.A. 905.)

12

and opinion. Significantly, the PPM itself warned investors in the partnership that "there is no assurance" that the Israeli government would grant approval. (J.A. 928.) Accordingly, the partnership could not demonstrate that it had a realistic prospect of exploiting any results of the research projects in its own trade or business.

## IV.

Because we find that the partnership's expenditures were done in its role as an investor, and were not done "in connection with [its] trade or business," and because we find that the partnership did not have a realistic prospect of exploiting any discoveries in a trade or business, the decision of the United States Tax Court is affirmed.

*AFFIRMED*

13