# United States Tax Court

T.C. Memo. 2022-62

GREGG MICHAEL KELLETT,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 21518-18.                                    Filed June 14, 2022.

————

*Lawrence A. Sannicandro*, for petitioner.

*Ka Tam* and *Bartholomew Cirenza*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

GREAVES, *Judge*: Respondent disallowed a $25,922 business expense deduction and determined a corresponding $6,475 deficiency for petitioner's 2015 tax year. We must decide what portion of these expenditures petitioner may deduct on his 2015 federal income tax return as costs of developing a business information website. Petitioner's active trade or business began when he opened his website to the public in September 2015. Section 162(a) allows him to deduct the $8,087 of business-related expenditures he paid thereafter as trade or business expenses, and section 195(b)(1)(B) allows him to ratably deduct the remaining $16,553 of business-related expenditures as start-up expenditures over the 180-month period beginning with September 2015.[1]

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code), Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all

[*2]                          FINDINGS OF FACT

The parties filed a Stipulation of Facts and a Supplemental Stipulation of Facts, both with accompanying exhibits, that are incorporated by this reference. Petitioner resided in Virginia when he petitioned this Court.

Petitioner is an entrepreneur with experience in information technology. After graduating from Marshall University in 2002 with a bachelor's degree in business management, petitioner launched a retail website, which he operated until 2007. He later joined the online marketing division of MarketResearch.com, a company that sells online reports and industry studies from more than 350 publishers. In 2011 he moved to Bloomberg Industry Group, a major publisher of legal and business information, where he managed paid advertising, web analytics and reporting, and search engine optimization for various Bloomberg brands.

While working approximately 40 hours per week at Bloomberg, petitioner began to work part time from home on his next venture: building an online repository of demographic, social, and economic data. He settled on the project after studying existing websites that aggregate this kind of information, which he found less user-friendly than investment information platforms like Google Finance and Yahoo Finance. He also discovered that he could download the data from free public domain sources like the International Monetary Fund, the World Bank, the United Nations Statistics Division, the World Health Organization, and the U.S. Department of Labor.

Petitioner set out to create a single user-friendly interface that would provide data from these dispersed sources to investment bankers, economists, journalists, investment management firms, and market research firms. In 2013 he purchased the vizala.com domain name and formed Vizala, LLC (Vizala or business), of which he was the sole member. Petitioner himself created the simple webpages such as the "About Us" page and instructions on how to use the website. He hired remote computer engineers to develop Vizala's interactive features that allowed users, for example, to create charts comparing countries' health expenditures per capita. Users could save their charts, export them to Microsoft Excel, and upload them to social media and their own

relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. This opinion rounds monetary amounts to the nearest dollar other than in the Appendixes.

[*3] websites. Petitioner described to the engineers how he wanted these features to work, and the engineers developed them using open-source software—free downloadable generic code for databases and advanced websites. Petitioner and the engineers completed Vizala's core functionality in March 2015, and worked to resolve software "bugs" before opening both the desktop and mobile versions of Vizala to the public in or around September 2015. In an example of a bug discussed at trial, petitioner asked an engineer to fix an interactive table that displayed incorrectly in the Firefox web browser.

Petitioner envisioned at least four ways to make money from Vizala: (1) selling advertising space to third parties, (2) implementing a "paywall" and charging a monthly fee for access to certain features of the website, (3) selling personalized charts and reports of information from the website, and (4) licensing data from the website to other companies. He did not pursue any of these strategies in 2015, and Vizala did not begin to earn revenue until 2019. Petitioner spent 2015 perfecting and promoting Vizala, convinced he could maximize long-term profit by cultivating confidence and dependence among users and advertisers before monetizing the business. After the website opened, petitioner and a marketing professional promoted the website to over a hundred universities and professional organizations, and about half these institutions added Vizala to their lists of research databases.

Petitioner timely filed Form 1040, U.S. Individual Income Tax Return, for his 2015 tax year, wherein he deducted $25,922 of "Other Expenses" on Schedule C, Profit or Loss From Business,[2] using cash method accounting.[3] These expenses consisted of $20,509 of payments to the engineers (engineer expenses), $2,410 paid to marketing professional Stacey Weliver (marketing expenses), $1,856 of payments to Verizon for cell phone service and internet service at petitioner's home

---

[2] Subject to exceptions not applicable here, a business entity that has a single owner and is not a corporation is disregarded as an entity separate from its owner for federal income tax purposes. *See* Treas. Reg. § 301.7701-2(c)(2)(i). An individual who owns a disregarded entity reports the entity's tax items on Schedule C. *See* 2015 Instructions for Schedule C, at C-1.

[3] The cash receipts and disbursements method generally requires that expenditures be deducted for the taxable year in which actually made. Treas. Reg. §§ 1.446-1(c)(1)(i), 1.461-1(a)(1); *see also Saviano v. Commissioner*, 80 T.C. 955, 964 (1983) ("[U]ntil a cash basis taxpayer suffers an economic detriment, i.e., an actual depletion of his property, he has not made a payment which will give rise to an expense deduction." (quoting *Rife v. Commissioner*, 356 F.2d 883, 889 (5th Cir. 1966), *rev'g and remanding* 41 T.C. 732 (1964))), *aff'd*, 765 F.2d 643 (7th Cir. 1985).

**[\*4]** (Verizon expenses), and \$1,148 for miscellaneous items related to Vizala (miscellaneous expenses). *See infra* Appendixes (listing the date and amount of each payment in the foregoing four categories). Respondent disallowed the entire deduction in a notice of deficiency mailed to petitioner on July 31, 2018, and petitioner sought redetermination of the deficiency in this Court.[4]

## OPINION

I.   *Burden of Proof*

The Commissioner's determinations set forth in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving the determinations are in error. Rule 142(a)(1); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). Moreover, deductions are a matter of legislative grace, and the taxpayer bears the burden of proving his entitlement to any deduction claimed. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). We denied by Order issued on February 4, 2021, petitioner's Motion of January 21, 2021, to shift the burden of proof to respondent under Rule 142(a)(1).

Petitioner made an oral motion at trial to shift the burden of proof to respondent under section 7491(a), paragraph (1) of which provides in pertinent part that if "a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer for [the federal income tax], the Secretary shall have the burden of proof with respect to such issue."[5] Paragraph (2)(B) further provides that the paragraph (1) burden shift applies with respect to an issue only if the taxpayer has maintained all records required by the Code.

As explained *infra* Part II, the burden of proof does not shift to respondent as to the date petitioner opened his website, the business purpose of the Verizon expenses, or the total amount of start-up expenditures. We otherwise decide the factual issues in this case on the preponderance of the evidence, and we need not decide which party has

---

[4] The notice of deficiency imposed a section 6662(a) accuracy-related penalty of \$1,295, which respondent conceded before trial.

[5] Section 7701(a)(11)(B) defines the "Secretary" as the Secretary of the Treasury or his delegate. The Secretary of the Treasury has delegated to the Commissioner the authority to litigate cases on behalf of the United States in the Tax Court. *See, e.g.*, Treas. Reg. § 601.509.

[*5] the burden of proof. *See Knudsen v. Commissioner*, 131 T.C. 185, 189 (2008), *supplementing* T.C. Memo. 2007-340.

## II. *Trade or Business Expenses and Start-Up Expenditures*

Petitioner argues that he can deduct all $25,922 reported on Schedule C as section 162 trade or business expenses. Respondent would deny the full amount as section 195 start-up expenditures that petitioner cannot deduct for 2015 because his active trade or business had not begun by the end of the year. We conclude in this Part II that section 162 permits petitioner to deduct the $8,087 of engineer expenses, marketing expenses, business-related Verizon expenses, and miscellaneous expenses paid after September 30, 2015, when his active trade or business began. He may deduct the remaining $16,553 of business-related expenditures, which are section 195 start-up expenditures, ratably over the 180-month period beginning with September 2015.

### A. *When Petitioner's Active Trade or Business Began*

Section 162(a) permits a deduction for ordinary and necessary expenses paid or incurred during the taxable year "in carrying on any trade or business." Section 195(a), on the other hand, generally denies a deduction for start-up expenditures, which section 195(c)(1)(A)(iii) defines in pertinent part to include any amount paid or incurred in connection with "any activity engaged in for profit and for the production of income before the day on which the active trade or business begins, in anticipation of such activity becoming an active trade or business." *See Hardy v. Commissioner*, 93 T.C. 684, 687 (1989) ("Start-up or pre-opening expenses are not currently deductible under section 162."). Without any regulations to tell us when an active trade or business begins,[6] we rely on a test developed by the U.S. Court of Appeals for the Fourth Circuit, the appellate venue for this case absent a stipulation by the parties. *See* § 7482(b); 28 U.S.C. § 41 (2018).[7] In the Fourth Circuit, a taxpayer does not begin carrying on a trade or business "until such time as the business has begun to function as a going concern and

---

[6] Sections 195(c)(2)(A) and 7701(a)(11)(B) direct us to determine when an active trade or business begins on the basis of regulations prescribed by the Secretary of the Treasury or his delegate, although no regulations have been promulgated.

[7] The Tax Court will follow a Court of Appeals decision which is squarely on point where appeal from our decision lies to that Court of Appeals alone. *Golsen v. Commissioner*, 54 T.C. 742, 757 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971).

6

[*6] performed those activities for which it was organized." *Richmond Television Corp. v. United States*, 345 F.2d 901, 907 (4th Cir. 1965),[8] *vacated and remanded per curiam on other grounds*, 382 U.S. 68 (1965). The Tax Court determines when this happens on the basis of the facts and circumstances of a given case. *Madison Gas & Elec. Co. v. Commissioner*, 72 T.C. 521, 566 (1979), *aff'd*, 633 F.2d 512 (7th Cir. 1980).

The Fourth Circuit did not allow Richmond Television Corp. to deduct staff training costs incurred in 1953–55 for its new television station because the business did not begin until the station went on the air in 1956. *Richmond Television*, 345 F.2d at 903–07. A television station, like a business information website, exists to communicate information to the public, via television programming in the former case and data aggregation and analysis software in the latter. Just as a television station can have no viewers until it begins broadcasting, Vizala could have no users before the website opened. Petitioner's active trade or business could not begin until that happened.

Unlike the television station in *Richmond Television*, however, Vizala had no revenue until well after going live. *See id.* at 903–04, 909 (explaining that the station launched in 1956 and sought to carry forward its business expense deductions as net operating losses to 1956 and 1957, which indicates it had income in those years). Respondent argues that none of the expenditures petitioner reported on Schedule C, even amounts paid after the website opened, is a section 162 expense because Vizala had no revenue and no means of generating revenue in 2015. A taxpayer's effort to sell goods or services may qualify as an active trade or business even if the taxpayer makes no sales and therefore has zero gross receipts. *See Cabintaxi Corp. v. Commissioner*, 63 F.3d 614, 620 (7th Cir. 1995), *aff'g in part, rev'g in part* T.C. Memo. 1994-316. Vizala, on the other hand, made no attempt to sell anything—

---

[8] The same case points out that the Code prohibits a business expense deduction for capital expenditures. *Richmond Television*, 345 F.2d at 907–08; *see also* § 263 (denying a deduction for capital expenditures). Respondent does not argue that any portion of the claimed deduction is a section 263 capital expenditure and concedes that only section 195 is at issue as to the business-related expenditures petitioner reported on Schedule C.

**[\*7]** advertisements, access to website features, customized reports, or licensed data—until after 2015.[9]

The typical case determining when an active trade or business begins contemplates a traditional business archetype: If initial operations succeed, the company should start earning revenue as soon as the active trade or business begins. For example, a grocery store will earn revenue by selling groceries as soon as it draws customers. *See Piggly Wiggly S., Inc. v. Commissioner*, 84 T.C. 739, 745–48 (1985) (allowing a store operator to deduct the cost of equipment placed in open stores, but denying the same deduction for stores not yet open), *aff'd*, 803 F.2d 1572 (11th Cir. 1986). By the same token, a company operating an apartment or office building should receive rent payments as soon as it admits tenants. *See Johnsen v. Commissioner*, 83 T.C. 103, 114–18 (1984) (denying deductions for pre-opening costs of rental property and discussing other cases reaching the same result), *rev'd on other grounds*, 794 F.2d 1157 (6th Cir. 1986).

Vizala does not fit this traditional archetype. Petitioner doubted that any of his revenue strategies could succeed until Vizala built rapport with users and advertisers. He therefore prioritized web traffic over revenue by charging no user fees and marketing the site to institutional customers. Even though petitioner made no attempt to earn revenue in 2015, his business began providing the services "for which it was organized," with an eye to long-term profit, once he opened the website. *See Richmond Television*, 345 F.2d at 907. Such activity, at least under these circumstances, constitutes an active trade or business.

The parties agree that Vizala opened to the public in or around September 2015. The burden of establishing the opening date does not shift to respondent under section 7491(a), *see supra* Part I, because petitioner has not proposed, let alone introduced credible evidence of, an opening date. We therefore err on the side of respondent by postulating

---

[9] In announcing its going-concern test, the Fourth Circuit cites Justice Frankfurter's concurring opinion in *Deputy v. du Pont*, 308 U.S. 488, 499 (1940), which asserts that carrying on a trade or business "involves holding one's self out to others as engaged in the *selling* of goods or services." *Richmond Television*, 345 F.2d at 907 n.7 (emphasis added). The Supreme Court later formally rejected Justice Frankfurter's gloss on the trade or business inquiry. *Commissioner v. Groetzinger*, 480 U.S. 23, 34 (1987).

[*8] that petitioner opened the website at the end of the day on September 30, 2015.

B.   *Trade or Business Expenses Deductible for 2015*

Respondent concedes the business purpose of the engineer expenses, marketing expenses, and miscellaneous expenses. We therefore conclude that petitioner may deduct the $7,928 of such expenses paid after September 30 as section 162 trade or business expenses. However, respondent argues that petitioner has not demonstrated the business purpose of the Verizon expenses. The Court should treat petitioner's payments for cell phone and internet services as nondeductible section 262(a) personal expenses, respondent contends, including amounts paid after petitioner's active trade or business began.

A taxpayer generally bears the burden of distinguishing the portion of an expense paid or incurred in carrying on a trade or business, which he may deduct under section 162(a), from any portion that is nondeductible as a section 262(a) personal expense. *See Commissioner v. Doak*, 234 F.2d 704, 708 (4th Cir. 1956) (citing *Sutter v. Commissioner*, 21 T.C. 170 (1953)), *rev'g* 24 T.C. 569 (1955). Petitioner's burden of proof with respect to the business purpose of the Verizon expenses does not shift to respondent under section 7491(a), *see supra* Part I, because petitioner failed to maintain documentation that differentiates his personal and business use of the Verizon services, *see* § 6001; Treas. Reg. § 1.6001-1(a), (e).

In certain circumstances, however, the Court may approximate a business expense if the taxpayer cannot substantiate its exact amount. *Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930).[10] The Court must have some basis on which to make an estimate, *Vanicek v. Commissioner*, 85 T.C. 731, 743 (1985), and "bear[s] heavily . . . upon the

---

[10] Although the Court may not approximate business expenses that are subject to the strict substantiation requirements of section 274(d), *Boyd v. Commissioner*, 122 T.C. 305, 320 (2004), section 274(d) does not apply to cell phone or internet expenses, *see* Small Business Jobs Act of 2010, Pub. L. No. 111-240, § 2043(a), 124 Stat. 2504, 2560 (removing cell phones from the definition of section 280F(d)(4) listed property, and thus from the scope of section 274(d), for tax years beginning after December 31, 2009); *Farran v. Commissioner*, T.C. Memo. 2007-151, slip op. at 14–15 (characterizing internet expenses as utility expenses and therefore not subject to strict substantiation).

[*9] taxpayer whose inexactitude is of his own making," *Cohan v. Commissioner*, 39 F.2d at 544.

Petitioner credibly testified that he used the Verizon services 80% to 90% for Vizala in 2015, with the remainder for personal reasons, but he presented no records tracking his business and personal use. Petitioner did submit a contemporaneously prepared Excel spreadsheet indicating that he averaged 49 hours per week working on Vizala during the last three months of 2015, which we find helpful in approximating petitioner's potential business use of the cell phone and internet services.

The 49 hours per week petitioner spent on Vizala required extensive use of his cell phone and the internet: talking with his hired personnel, downloading data, sending emails, and reviewing the progress of the website online. Added to the 40 hours per week petitioner spent working for Bloomberg, during which time he used the Verizon service only sparingly, that makes 89 hours per week he spent working and 79 hours per week he spent not working. We appreciate that he did not use the Verizon service for nonbusiness purposes during the entire 79 nonworking hours in each week, but petitioner did not submit evidence allocating this time to other activities such as eating and sleeping.

Bearing heavily against petitioner, we estimate his business use of the Verizon services on the basis of the ratio of the 49 hours per week he spent on Vizala to the 128 hours per week he spent working on Vizala or not working. Accordingly, petitioner has established the business purpose of 38.3% of the $415 of Verizon expenses paid after September 30, or $159.

C.  *Years for Which Petitioner Can Deduct His Start-Up Expenditures*

Section 195(b)(1)(A) generally permits a taxpayer to deduct up to $5,000 of start-up expenditures for the year his active trade or business begins.[11] Section 195(b)(1)(A)(ii) denies this deduction to a taxpayer whose total start-up expenditures, including those paid or incurred

---

[11] Section 195(d) requires a taxpayer to elect into section 195(b), which petitioner did by claiming a deduction for the start-up expenditures he paid in 2015 on his timely filed return. *See* I.R.S. Publication 535, Business Expenses: For Use in Preparing 2015 Returns, 24; *see also* Treas. Reg. § 1.195-1(b) (explaining that a taxpayer is deemed to have made a section 195(b) election).

[*10] before the year his active trade or business begins, exceed $55,000. Petitioner failed to introduce any evidence, let alone credible evidence, of his costs of developing Vizala from the time he began work on the project circa 2013 to the end of 2014, leaving us to guess his total start-up expenditures. Petitioner retains the burden of proof on this issue, *see supra* Part I, which he has not satisfied, and he may not deduct start-up expenditures under section 195(b)(1)(A).

Section 195(b)(1)(B) allows a taxpayer to deduct start-up expenditures ratably over the 180-month period beginning with the month in which the active trade or business begins. Petitioner's Excel spreadsheet shows he averaged 37 hours per week working on Vizala during the first nine months of 2015. By the reasoning *supra* Part II.B, petitioner has established the business purpose of 28.8% of the $1,441 of Verizon expenses paid before September 30, or $414. Adding this to the $16,138 of engineer expenses, marketing expenses, and miscellaneous expenses paid before September 30 makes a total of $16,553 of 2015 start-up expenditures. Petitioner may deduct this amount ratably over the 180-month period beginning with September 2015, when his active trade or business began.

III.    *Petitioner's Alternative Arguments*

To the extent we hold that he may not deduct any of the engineer expenses as section 162 trade or business expenses, petitioner argues that he can deduct them as section 174 research or experimental expenditures, or as costs of developing computer software under Rev. Proc. 2000-50, 2000-2 C.B. 601. We address each argument in turn.

A.    *Section 174*

Section 195(c)(1) excludes from the definition of start-up expenditures any amount with respect to which a deduction is allowable under section 174. Section 174(a)(1), as in effect for 2015, allows a taxpayer to deduct "research or experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business."[12]    Treasury Regulation § 1.174-2(a)(1) defines research or experimental expenditures as "expenditures incurred in connection with the taxpayer's trade or business which represent research and development costs in the experimental or laboratory

---

[12] Congress withdrew the deduction for amounts paid or incurred in tax years beginning after December 31, 2021. *See* Tax Cuts and Jobs Act, Pub. L. No. 115-97, § 13206, 131 Stat. 2054, 2111 (2017).

**[\*11]** sense." This means the expenditures "are for activities intended to discover information that would eliminate uncertainty concerning the development or improvement of a product." *Id.* "Uncertainty exists," the regulation continues, "if the information available to the taxpayer does not establish the capability or method for developing or improving the product or the appropriate design of the product." *Id.* Petitioner may not deduct any of his expenditures under section 174 because he did not encounter this kind of uncertainty in creating Vizala.

A pair of cases involving the section 41 credit for increasing research activities, which requires the taxpayer to demonstrate that expenditures may be treated as section 174 expenditures, *see* § 41(d)(1)(A),[13] illustrates how to understand "uncertainty" in the context of software development. In the first case the court denied taxpayer Morris Davenport a section 41 credit for wages paid to develop software that would automate and integrate the manufacturing, design, sales, accounting, and shipping aspects of his business. *United States v. Davenport*, 897 F. Supp. 2d 496, 499–501, 518 (N.D. Tex. 2012). An outside contractor created the software using a commercially available software application suite. *Id.* at 500, 510–11. After conferring with Mr. Davenport's employees to understand their needs, the contractor developed a preliminary product by following a standardized process based on "industry best practices" and resolved problems and added functionalities according to the employees' feedback. *See id.* at 510–14. Although the project consumed lots of time and effort, the record reflected a straightforward application of the tried and true development process the contractor apparently followed in service of other clients. *See id.* at 515.

At the other end of the spectrum lies Eric Suder, whose company's costs of developing a series of phone systems passed the section 174 test. *See Suder v. Commissioner*, T.C. Memo. 2014-201, at \*1–30, \*42–44. Although the company followed a systematic development process, neither Mr. Suder nor his team knew exactly what steps to follow to create the products they conceived or how the products would be designed. *Id.* at \*8, \*42–43. Each project began at the drawing board: Senior management brainstormed an idea for a new product and drafted a rudimentary diagram and specifications which their engineers used to make the idea commercially viable. *Id.* at \*8–9. The company's

---

[13] Congress revised section 41(d)(1)(A) effective for tax years beginning after December 31, 2021, to conform to the revision of section 174 described in the preceding note. *See* Tax Cuts and Jobs Act § 13206(d)(1), 131 Stat. at 2112.

[*12] hardware was proprietary, so employees had to create what they needed out of whole cloth using their own expertise. *Id.* at *10–11. Software engineers tested and retested computer code to perfect the timing of the products' components within milliseconds. *Id.* at *12. In one case the company created a softphone that allowed the user to make calls from a personal computer while traveling, which presented the challenge of developing software capable of transferring calls through hotel routers and firewalls. *Id.* at *18. When the Internal Revenue Service (IRS) expert questioned the team's failure to develop the softphone using open-source software, an employee credibly testified that this would have required significant and time-consuming changes to the product. *Id.* at *41.

Vizala followed the *Davenport* paradigm: Petitioner and his engineers adapted widely used software to solve a complex but familiar problem. Petitioner's project did not start from the "drawing board" in the same sense as Mr. Suder's softphone. Petitioner aimed to create a data aggregation website, which companies such as Google Finance had done before, only his website would present demographic, social, and economic data instead of the financial information available on professional-quality platforms. Whereas the softphone required Mr. Suder's team to write code from a blank slate, Vizala permitted the use of open-source software customized for petitioner's needs. Like Mr. Davenport's employees, petitioner described to his engineers how the product should work, and, as an inherent part of designing complex software, collaborated with the engineers to troubleshoot problems before launch. *Cf. id.* at *39–40 (disagreeing with the IRS's position that Mr. Suder's team encountered only the kind of uncertainty inherent in every large development effort). As in Mr. Davenport's case, we conclude that petitioner may not deduct his expenses under section 174.

B.    *Rev. Proc. 2000-50*

Petitioner argues that he may deduct the engineer expenses on the basis of Rev. Proc. 2000-50, §§ 4, 5.01, 2000-2 C.B. at 601, which announces that the IRS will not disturb a taxpayer's immediate deduction of certain costs of developing computer software that the taxpayer has not treated as section 174 research or experimental expenditures. We must reject this argument because, to the extent Rev. Proc. 2000-50 purports to establish a taxpayer's entitlement to a deduction, petitioner has not demonstrated that the Code authorizes any such deduction.

**[\*13]** Rev. Proc. 2000-50 mimics the section 174 exception to the capitalization rules of sections 195 and 263. As explained *supra* Part II.A, section 162(a) permits a deduction for ordinary and necessary expenses paid or incurred during a taxable year "in carrying on any trade or business," but section 195 generally denies an immediate deduction for start-up expenditures paid or incurred before the "active trade or business" begins. Moreover, section 263(a)(1) generally denies an immediate deduction for amounts paid for permanent improvements to property, which the title of section 263 calls "capital expenditures." *See Woodward v. Commissioner*, 397 U.S. 572, 575 (1970) (explaining that a taxpayer cannot deduct a capital expenditure under section 162). The taxpayer "capitalizes" section 195 and section 263 expenditures, *see* § 1016(a)(1) (providing a basis adjustment for expenditures "properly chargeable to capital account"), and in some cases can deduct them over subsequent years through depreciation or amortization, *see, e.g.*, §§ 167, 195(b).

As in effect for 2015, *see supra* note 12, section 174(a)(1) overrides these capitalization rules for research or experimental expenditures paid or incurred by the taxpayer during the taxable year "in connection with his trade or business." The taxpayer need not actually be engaged in a trade or business to incur an expenditure "in connection with his trade or business," but there must be a realistic prospect at the time of the expenditure that the taxpayer will enter a trade or business involving the technology being developed. *See Lewin v. Commissioner*, 335 F.3d 345, 347–48 (4th Cir. 2003), *aff'g per curiam* T.C. Memo. 2001-10. Such expenditures are not start-up or capital expenditures. *See* §§ 195(c)(1) (flush text), 263(a)(1)(B); *see also* § 263A(c)(2) (exempting any amount allowable as a deduction under section 174 from section 263A(a)(1), which requires that certain costs be included in inventory costs or capitalized). The taxpayer may either deduct the expenditures in the taxable year they are paid or incurred, § 174(a), or capitalize and deduct them ratably over 60 months, § 174(b).

On the theory that they "so closely resemble" section 174 expenditures "as to warrant similar accounting treatment," Rev. Proc. 2000-50, §§ 4 and 5.01, purports to allow the same timing election for certain costs of developing computer software that the taxpayer has not treated as section 174 expenditures. The revenue procedure announces in pertinent part that the IRS "will not disturb" a taxpayer's deduction of these costs "in accordance with rules similar to those applicable under § 174(a)," or capitalization and recovery of the costs through amortization deductions "in accordance with rules similar to those

[*14] provided by § 174(b) and the regulations thereunder" or other rules described in the revenue procedure. *Id.*; *see also* T.D. 9107, 2004-1 C.B. 447, 452 (preamble to regulations under section 263 directing taxpayers to rely on Rev. Proc. 2000-50 to determine when to deduct computer software development costs).

1. *Respondent Failed to Explain How to Coherently Apply Rev. Proc. 2000-50.*

Respondent does not dispute that the engineer expenses are costs of developing computer software as defined in Rev. Proc. 2000-50, but insists that petitioner cannot deduct any of the expenses he reported on Schedule C because his active trade or business did not begin until after 2015. Respondent argues that allowing petitioner to deduct amounts paid before his active trade or business began, even if they satisfy the criteria of Rev. Proc. 2000-50, is not authorized by the Code and would be "making new law contrary to congressional intent."

We cannot reconcile respondent's gloss on Rev. Proc. 2000-50 with the terms of the revenue procedure itself, for two reasons. First, Rev. Proc. 2000-50 announces that the IRS "will not disturb" a deduction that satisfies its criteria, with no caveat about an active trade or business. Unlike section 174, the revenue procedure does not even require that expenditures be incurred "in connection with" a trade or business. Yet even if it did, respondent does not deny that petitioner had a realistic prospect as of the beginning of 2015 of entering a trade or business involving the website under development. *See Lewin v. Commissioner*, 335 F.3d at 347–48 (discussed *supra*). Second, the stated purpose of Rev. Proc. 2000-50 is to provide accounting treatment of the kind allowed by section 174, and the manifest purpose of section 174 is to suspend the capitalization rules of sections 195 and 263 for research or experimental expenditures. Withholding the Rev. Proc. 2000-50 deduction from a taxpayer whose active trade or business has yet to begin makes no sense because the revenue procedure is meant to provide relief from this requirement.

Neither do we agree with respondent's attempt to reconcile Rev. Proc. 2000-50 with the Code. Rev. Proc. 2000-50 does not say which part of the Code authorizes its timing rule for costs of developing computer software that the taxpayer has not treated as section 174 expenditures. Although respondent argued at trial that the authority comes from section 162, *see also* David E. Hardesty, Electronic Commerce: Taxation & Planning, para. 7.06(3)(b)(iv) (2021), Westlaw ECOMM WGL

**[\*15]** (inferring the same), the rule is both too narrow and too broad for this argument to hold water.  On the one hand, section 162 allows as a deduction "*all the ordinary and necessary expenses* paid or incurred during the taxable year in carrying on any trade or business." (Emphasis added.)  Yet Rev. Proc. 2000-50 applies only to costs of developing computer software, not any other costs paid or incurred in carrying on the same trade or business, assuming arguendo that a taxpayer who pays or incurs such costs is carrying on a trade or business at all.  On the other hand, Rev. Proc. 2000-50 purports to allow a taxpayer to deduct costs paid or incurred before his active trade or business begins per section 195, if indeed an active trade or business ever begins, and irrespective of whether the costs otherwise would be nondeductible section 263 capital expenditures.  As explained *supra*, Rev. Proc. 2000-50 exists to supersede these capitalization rules, which themselves supersede the section 162 deduction for trade or business expenses.

> 2. *Petitioner Failed to Advance a Viable Claim Based on Rev. Proc. 2000-50.*

Petitioner makes no attempt to justify Rev. Proc. 2000-50 as consistent with the Code.  He argues that the engineer expenses satisfy the Rev. Proc. 2000-50 criteria for deduction and that the IRS is "estopped" from taking a position contrary to its own guidance.  Petitioner has the burden of establishing his entitlement to any deduction claimed, as explained *surpa* Part I, so we assume without deciding that the Rev. Proc. 2000-50 deduction lacks statutory authorization.

Courts generally treat revenue procedures as governing internal IRS operations and hold that they do not create substantive rights in the public.  *Capitol Fed. Sav. & Loan Ass'n & Sub. v. Commissioner*, 96 T.C. 204, 216–17 (1991).  The Fourth Circuit reached the same holding as to "rules laid down by the Commissioner for the regulation of the affairs of his office."  *See Luhring v. Glotzbach*, 304 F.2d 560, 563–65 (4th Cir. 1962).  To the extent Rev. Proc. 2000-50 establishes an administrative policy not to "disturb" a deduction that complies with its criteria, irrespective of whether the Code authorizes the deduction, *Capitol Federal* and *Luhring* dictate that Rev. Proc. 2000-50 offers petitioner no remedy.

When the IRS has announced to taxpayers in a revenue procedure how it will exercise discretion conferred by the Code, however, the Tax

**[\*16]** Court has set aside as an abuse of discretion the IRS's failure to honor the revenue procedure in individual cases. *See Capitol Fed.*, 96 T.C. at 217–20. Section 446(b), for example, grants the IRS broad discretion to determine whether an accounting method "clearly reflect[s] income," a concept the Code does not define, and therefore whether a taxpayer may use that method to compute taxable income.[14] *See Commissioner v. Hansen*, 360 U.S. 446, 467 (1959) (discussing the predecessor of section 446). The IRS abused this discretion by denying a taxpayer the use of an accounting method permitted by Rev. Proc. 71-21, 1971-2 C.B. 549, even though the taxpayer qualified to use the method by the terms of the revenue procedure itself. *Barnett Banks of Fla., Inc. v. Commissioner*, 106 T.C. 103, 116–17 (1996).

Before we can find an abuse of discretion, however, we must find a grant of discretion. *See Woodral v. Commissioner*, 112 T.C. 19, 25 (1999) ("[A] person with no discretion simply cannot abuse it."). The Supreme Court has acknowledged the self-evident principle that "Congress, not the Commissioner, prescribes the tax laws." *Dixon v. United States*, 381 U.S. 68, 73 (1965). IRS guidance that operates to create a rule out of harmony with the Code is a mere nullity, *see id.* at 74 (citing *Manhattan Gen. Equip. Co. v. Commissioner*, 297 U.S. 129, 134 (1936)), and cannot in and of itself bar the United States from collecting a tax otherwise lawfully due, *see id.* at 73. To the extent Rev. Proc. 2000-50 purports to establish the taxpayer's entitlement to a deduction, therefore, we cannot sustain the rule without a statutory predicate.

Petitioner apparently asks us to enforce the Rev. Proc. 2000-50 deduction on the basis of a theory of equitable estoppel,[15] whereby courts aid a party who has relied in good faith to his detriment upon the representations of another. *United States v. Fid. & Cas. Co. of N.Y.*, 402 F.2d 893, 897 (4th Cir. 1968). The doctrine "operates to place the person entitled to its benefit in the same position he would have been in had the representations been true." *CIGNA Corp. v. Amara*, 563 U.S. 421,

---

[14] Sections 446(b) and 7701(a)(11)(B) confer this authority on the Secretary of the Treasury or his delegate, and the regulations underlying section 446 confirm that the Secretary of the Treasury has delegated this authority to the IRS. *See, e.g.*, Treas. Reg. § 1.446-1(a)(2) ("[N]o method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income.").

[15] Petitioner cites *Rauenhorst v. Commissioner*, 119 T.C. 157 (2002), which did not estop the IRS from disavowing its own guidance. The Court treated as an IRS concession its own bright-line rule, announced in a revenue ruling that acquiesced in a Tax Court decision, simplifying the complex question of when a taxpayer recognizes income on a post-donation sale of donated property. *See id.* at 164–73.

**[\*17]** 441 (2011) (quoting J. Eaton, Handbook of Equity Jurisprudence § 62 (1901)). Even if the Rev. Proc. 2000-50 deduction lacks congressional authorization, that is, petitioner argues that it would be unfair to allow the IRS to deny a deduction it guaranteed in published guidance. Assuming arguendo that equitable estoppel ever applies against the Government, *see Dawkins v. Witt*, 318 F.3d 606, 611 (4th Cir. 2003) (expressing skepticism), the remedy is available only in a court of equity, not a court of law, *see McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176, 180–81 (4th Cir. 2012) (citing *Amara*, 563 U.S. at 439–41). As a court of law, the Tax Court has no authority to impose equitable estoppel. *See Stovall v. Commissioner*, 101 T.C. 140, 149–50 (1993).

To reflect the foregoing,

*An order will be issued denying petitioner's oral Motion to Shift Burden of Proof under section 7491(a), and decision will be entered under Rule 155.*

**[*18]**                    APPENDIX A: Engineer Expenses

| Date | Recipient | Amount |
|------|-----------|--------|
| 1/2/2015 | Joachim Noreiko | $664.46 |
| 1/2/2015 | Thomas Seidl | 3,439.76 |
| 1/26/2015 | Joachim Noreiko | 513.88 |
| 4/3/2015 | Rik de Boer | 280.53 |
| 4/8/2015 | Thomas Seidl | 1,876.62 |
| 8/20/2015 | Thomas Seidl | 7,347.77 |
| 10/1/2015 | Joachim Noreiko | 716.07 |
| 11/3/2015 | Mike Stefanello | 100.00 |
| 12/23/2015 | Thomas Seidl | 5,569.41 |

APPENDIX B: Marketing Expenses

Petitioner paid the amounts in the following table to Stacey Weliver.

| Date | Amount |
|------|--------|
| 6/23/2015 | $230 |
| 7/28/2015 | 250 |
| 8/20/2015 | 690 |
| 9/3/2015 | 130 |
| 10/5/2015 | 430 |
| 10/19/2015 | 310 |
| 11/2/2015 | 370 |

**[*19]**                    APPENDIX C: Verizon Expenses

Petitioner paid the amounts in the following table to Verizon for cell phone service and internet service at petitioner's home.

| Date | Amount |
|------|--------|
| 1/12/2015 | $76.13 |
| 1/20/2015 | 79.99 |
| 2/11/2015 | 84.92 |
| 2/18/2015 | 79.99 |
| 3/11/2015 | 76.09 |
| 3/20/2015 | 79.99 |
| 4/10/2015 | 77.35 |
| 4/17/2015 | 79.99 |
| 5/12/2015 | 77.18 |
| 5/22/2015 | 79.99 |
| 6/10/2015 | 88.77 |
| 6/17/2015 | 79.99 |
| 7/10/2015 | 83.71 |
| 7/20/2015 | 79.99 |
| 8/12/2015 | 79.51 |
| 8/17/2015 | 79.99 |
| 9/10/2015 | 77.21 |
| 9/17/2015 | 79.99 |
| 10/13/2015 | 53.00 |
| 10/19/2015 | 87.99 |
| 11/12/2015 | 49.18 |
| 11/17/2015 | 87.99 |
| 12/10/2015 | 49.20 |
| 12/18/2015 | 87.99 |

**[*20]**             APPENDIX D: Miscellaneous Expenses

| Date | Schedule C Designation | Amount |
| --- | --- | --- |
| 1/5/2015 | UPS Store – Business Mailbox | $202.40 |
| 1/20/2015 | Audible.com Education | 22.95 |
| 2/3/2015 | Harvard Business Services | 249.00 |
| 2/20/2015 | Audible.com Education | 22.95 |
| 3/23/2015 | GoDaddy.com | 25.16 |
| 3/23/2015 | GoDaddy.com | 50.32 |
| 4/27/2015 | External Hard Drive | 69.15 |
| 4/28/2015 | Audible.com Education | 14.95 |
| 5/28/2015 | Audible.com Education | 14.95 |
| 6/29/2015 | Audible.com Education | 14.95 |
| 7/28/2015 | Audible.com Education | 7.49 |
| 8/28/2015 | Audible.com Education | 7.49 |
| 9/9/2015 | Microsoft Office | 6.00 |
| 9/28/2015 | Audible.com Education | 7.49 |
| 10/9/2015 | Microsoft Office | 6.00 |
| 10/14/2015 | USTPO Trademark application | 275.00 |
| 10/28/2015 | Audible.com Education | 14.95 |
| 11/9/2015 | Microsoft Office | 6.00 |
| 11/30/2015 | Audible.com Education | 14.95 |
| 12/9/2015 | Microsoft Office | 6.00 |
| 12/28/2015 | Crashplan Computer Backup Service | 59.99 |
| 12/28/2015 | Harvard Business Services | 50.00 |